*In re* MARRIAGE OF THOMAS A. McGOWAN, Petitioner-Appellant, and MARIE B. McGOWAN, Respondent-Appellee.

First District (5th Division)   No. 79-1330

Opinion filed May 9, 1980.

Roderick F. Mollison and John J. Collins, both of Chicago, for appellant.

William H. LeVitus, of Chicago, for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This action involves the provisions of the new Marriage and Dissolution of Marriage Act (Marriage Act) as they pertain to the modification and termination of maintenance of a former spouse. (Ill. Rev. Stat. 1977, ch. 40, pars. 510(a) and 510(b).) Petitioner appeals from the denial of his petitions to modify the divorce decree entered in his marriage to respondent, by ordering the termination of maintenance payments to her and relieving petitioner of his obligation to insure his life for respondent's benefit. On appeal, petitioner contends that (1) the trial court erred in its determination that the evidence was insufficient to terminate maintenance, and (2) petitioner was denied due process of law by the court's refusal to allow evidence in support of his petition to terminate alimony. We affirm. The pertinent facts follow.

Petitioner's initial petition alleged that the parties were divorced on

January 12, 1973, and that he was ordered to pay $500 per month in maintenance, based upon his net income of $1750 and the fact that respondent was then unemployed. Petitioner was also ordered to retain a $5000 life insurance policy on his life with respondent named as irrevocable beneficiary. Petitioner further alleged that respondent was employed and was then living with a man, not her husband, on an "open and notorious" basis. In his supplemental petition, petitioner alleged substantial changes in his financial circumstances due to his remarriage, that the original divorce decree was entered when respondent was in poor health and unable to work, and that respondent was now healthy, working and living in an apartment in which her utilities, telephone and 40 percent of her rent are paid by her landlord. In a subsequent supplemental petition, petitioner alleged that he had paid over $40,000 as maintenance since the divorce and that the basis for maintenance no longer existed. Petitioner asked that the divorce decree be modified by terminating his maintenance payments to respondent.

After testifying to the terms of the divorce settlement, petitioner called respondent as a witness under section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1977, ch. 110, par. 60.) Although she had been unemployed at the time of the divorce, respondent was now a part-time employee of the United States Census Bureau, earning $3.96 per hour for conducting interviews. She was also reimbursed for her expenses. During 1978 respondent had earned $2200 and her income for the first five months of 1979 was about $900. Respondent's assets consisted of some stocks and bonds and approximately $19,000 in savings, all of which were part of the divorce settlement. Respondent maintained two residences, living at her father's home about 20 percent of the time and spending the rest of her time in an apartment she rented from a long-time friend, Dr. John T. Chedester. Her apartment rental had been increased to $275 per month in May 1979. Prior to that time her monthly rent was $250 but, until November 1978, she had received a $100-per-month credit for doing occasional laundry, cleaning and reception work for Dr. Chedester's dental office.

Respondent's apartment was on the second floor of the building which contained Dr. Chedester's offices. Her apartment adjoined the doctor's living quarters, which was a single room with two closets and a private entrance. Respondent had been in the doctor's apartment, but estimated that the most recent visit was during the summer of 1978. The doctor had a key to respondent's apartment because he was her landlord, she testified, but she did not have access to the doctor's apartment because he kept the door locked and she had no key. There was no bathroom in the doctor's apartment, respondent continued, and he used

the facility on the first floor and in the basement, although he had used her bathroom on occasion.

Dr. Chedester frequently visited respondent in her apartment and the two sometimes ate meals together. The doctor would periodically remain to visit a while in the evening after dinner. Respondent also testified that the doctor kept no clothes in her apartment, but she did have some of his books, which she had borrowed for her work. He had also borrowed some money from respondent a few times and had repaid her, with interest.

William Witsman, a licensed private detective, was hired by petitioner's attorney to view respondent's apartment pursuant to a court order. Arriving at the building unannounced, Witsman was not allowed to see respondent's apartment and arranged to return the following day. When he returned, Witsman was shown respondent's apartment. He saw no men's clothing or toiletries, but saw some of Dr. Chedester's books.

Dr. Chedester testified that his living quarters measured about 12 feet by 12 feet. He had lived there for about 20 years and his mother had occupied the larger area now rented by respondent. His mother had become quite senile prior to her death in 1971, which prompted the doctor to install the lock on his door. He had the only key. There was a shower in the basement but he admitted that he sometimes used respondent's bathroom. Respondent moved into the apartment in July of 1977 and lived there only part of the time, spending the rest of her time at her father's home. The doctor also owned a farm which he had been renting to an older couple. After the death of the husband, he allowed the widow to live on the farm for a low rental in order to keep it occupied. The doctor had a trailer on the farm for himself, and he lived there in the summer. Dr. Chedester further testified that he had known respondent since the early 60's. He knew her father well and visited him both before and after respondent was divorced. The doctor had also lent some money to respondent, as well as to another tenant, a dentist with offices on the first floor of the building.

Respondent testified on her own behalf that her mother, who was deceased, was a very good friend of Dr. Chedester's mother. Respondent had known the doctor since early in the 1960's. They had visited her father many times and the three of them had taken some short trips into Wisconsin, although they never stayed overnight. She had also visited the doctor's farm, but had never eaten a meal or spent the night in either the farmhouse or the doctor's trailer. Respondent considered him a friend who would help her in times of difficulty. She received no Christmas or birthday gifts from the doctor and testified that she was not living with him in a husband and wife relationship.

Petitioner had also questioned respondent about a 1973 credit application which listed a monthly income of $500 and her former attorney as her employer. Respondent explained that she was unemployed in 1973, but received her $500 monthly maintenance payment and therefore listed her attorney to verify the source of income.

After hearing all of the evidence, the trial court found that respondent and the doctor were not living together in a "continuing conjugal relationship" and that there had not been any substantial change in respondent's circumstances. Petitioner's requests for a termination or modification of alimony were then denied and he has appealed.

OPINION

Petitioner first contends that the trial court's denial of termination or modification of maintenance was arbitrary and capricious and contrary to law under section 510 of the Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 510). Section 510 provides in pertinent part:

"(a) Except as otherwise provided in paragraph (f) of Section 502, the provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to the filing of the motion for modification with due notice by the moving party and only upon a showing of a substantial change of circumstances. * * *.

(b) The obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing, conjugal basis."

According to petitioner, sections 510(a) and 510(b) should be read together so that any relationship on a "resident, continuing familial basis" would be a change of circumstances which would require the termination of maintenance. As petitioner's position was explained at oral argument, if cousins or a brother and sister lived together, termination of maintenance under section 510(b) would be mandated.

At the heart of petitioner's argument is his contention that the legislature intended the term "conjugal" to be defined as "familial" rather than "marital." The "familial" nature of conjugal cohabitation, as defined by petitioner, rests on a mutuality of affection and friendship, and includes the financial benefits resulting from sharing living quarters and living expenses. Sexual conduct, he submits, is not to be considered.

Petitioner's argument fails for two reasons. First, petitioner's definition applies to any cohabitation, thus rendering the word "conjugal" superfluous. This is contrary to fundamental rules of statutory construction that each word be given a reasonable meaning, if possible, and that the legislature will not be presumed to include unnecessary

words in a statute. (*Hirschfield v. Barrett* (1968), 40 Ill. 2d 224, 239 N.E.2d 831, *cert. denied* (1969), 393 U.S. 1062, 21 L. Ed. 2d 706, 89 S. Ct. 716; *Skillet Fork River Outlet Union Drainage District v. Fogle* (1943), 382 Ill. 77, 46 N.E.2d 73.) Secondly, the three cases in which section 510(b) has been interpreted by appellate courts disclose a general agreement that by "conjugal" the legislature meant a relationship of a husband and wife nature, including its sexual aspects. *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469; *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 392 N.E.2d 764; *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 388 N.E.2d 1131.

Section 510(b) was first considered in *Halford*. After tracing the history of section 510(b) and noting its departure from the previous rule in Illinois and its addition of the language pertaining to "resident, continuing conjugal" cohabitation to the model provided by section 316(b) of the Uniform Marriage and Divorce Act (9 U.L.A. §316(b), at 500 (1973)), the court stated:

> "We believe that it was the intention of our legislature to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means." (70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134.)

The *Halford* court further stated that section 510(b) "contemplates acts of sexual intercourse as part of the full or *de facto* husband-wife relationship which it seeks to describe." (70 Ill. App. 3d 609, 613, 388 N.E.2d 1131, 1134.) The court reasoned that cohabitation does not necessarily imply sexual intercourse, although it does mean living together as husband and wife, while a conjugal relationship implies the assertion of conjugal rights, which have been defined as the right of sexual intercourse between husband and wife. (70 Ill. App. 3d 609, 613, 388 N.E.2d 1131, 1134.) The *Schoenhard* court agreed with the reasoning in *Halford* and accepted that court's construction of section 510(b).

The *Halford* court's reasoning was recently accepted and applied in *Bramson*, a case arising in this district. The trial court had ordered the termination of alimony under section 510(b) where the former wife had lived with another man for approximately four months although she moved to the apartment of a female friend when the petition to terminate maintenance was filed. The trial court had entered a final order which provided in part:

> " '* * * [T]he law in Illinois is that where a woman lives with another man, not her husband, she is no longer entitled to alimony and her right to alimony is thereby terminated.' " (*Bramson*, 83 Ill. App. 3d 657, 660, 404 N.E.2d 469, 471.)

This court rejected the trial court's interpretation of the law and in reversing stated:

> "In short, we view the trial court's assertion that '[o]nce you live with a man, you have voided your chance to get alimony,' to be an overbroad and erroneous interpretation of legislative intent." 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.

■■ We accept the interpretation of the legislative intent of section 510(b) as expressed in *Halford, Schoenhard* and *Bramson* and conclude that for the termination of maintenance to be required under section 510(b) because of cohabitation, that cohabitation must be on a resident and continuing basis and must also be in the nature of a husband-wife relationship which necessarily includes sexual conduct. Contrary to petitioner's contention, this does not amount to punishment of the former spouse for immoral behavior, which was prohibited by *Hall v. Hall* (1975), 25 Ill. App. 3d 524, 323 N.E.2d 541. As was noted in *Bramson*, 83 Ill. App. 3d 657, 661, 404 N.E.2d 469, 472, the termination of maintenance upon the recipient's resident, continuing and conjugal conhabitation with another person was most likely added to section 510(b) to end the inequities caused when a former spouse had in fact entered into a husband-wife relationship, although not formalized legally, and was still entitled to maintenance merely because Illinois does not recognize common law marriages. See also *Halford*, 70 Ill. App. 3d 609, 613, 388 N.E.2d 1131, 1134.

We also disagree with petitioner's assertion that sections 510(a) and 510(b) should be read together. Section 510(a) is permissive and allows the trial court to exercise its discretion in modifying maintenance or support by providing that it "may be modified * * * only upon a showing of a substantial change of circumstances." Section 510(b), on the other hand, is mandatory and flatly states that the obligation to pay maintenance "is terminated" by the "resident, continuing conjugal" cohabitation of the recipient with another person. Furthermore, the discretionary standard for modification of maintenance found in section 510(a) is essentially unchanged from its applications under the former Divorce Act. (See generally Ill. Rev. Stat. 1975, ch. 40, par. 19; *Miller v. Miller* (1978), 65 Ill. App. 3d 844, 846, 382 N.E.2d 823, 826; *Baker v. Baker* (1977), 53 Ill. App. 3d 186, 189-90, 368 N.E.2d 379, 382.) Consequently, because, as the *Halford* court noted, section 510(b) "has made a break with past law" (70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134), reading sections 510(a) and 510(b) together would disregard the clearly expressed intention of the legislature to establish a new and distinct standard for termination of maintenance. We will therefore consider petitioner's appeal under both sections 510(a) and 510(b).

■■ We find no abuse of the court's discretion in refusing to terminate maintenance under section 510(a), for the evidence discloses no

substantial change in the circumstances of the parties. Petitioner's definition of respondent's current financial status relies heavily on a large amount in savings and certain stock holdings, which were assets derived from the divorce settlement itself. However, those assets cannot be considered in measuring the alleged improvement in respondent's financial circumstances, for to do so constitutes an attack on the divorce decree itself. (See *Shive v. Shive* (1978), 57 Ill. App. 3d 754, 373 N.E.2d 557.) The principal change in respondent's financial position was that she had obtained part-time employment which generated an annual income less than $3000. At the same time her rent had increased from $250 per month to $275 and she no longer received a $100 deduction from her rent for work done in Dr. Chedester's office.

Petitioner also maintains that respondent was less than candid in testifying about her financial status, but the credibility of the witnesses is to be determined in the trial court, not on appeal. Petitioner further contends that he was denied due process because the trial court interfered with the questioning of respondent regarding her savings, income and employment. We have examined each of the five instances cited by petitioner. When read in their proper context, they show no improper interference with the examination of respondent. In each instance counsel for petitioner either abandoned a question or resumed questioning the witness following an interruption by the court either in response to objections or in an apparent effort to discern the relevancy of counsel's questions. At no time did petitioner's counsel object to the proceedings or make an offer of proof. We therefore find no error with regard to the production of evidence, for the failure to admit evidence was due to petitioner's failure to introduce it in the first place.

Turning to petitioner's claim under section 510(b), we note only that petitioner has repeatedly and emphatically stated that he did not elicit or attempt to elicit any evidence of sexual conduct, relying on his belief that sexual conduct was not in issue. This misplaced reliance was fatal to petitioner's claim under section 510(b). We do not agree that requiring evidence of sexual conduct poses a public-policy problem as to the standard of proof, and we are aware that it may not always be possible to elicit direct testimony of sexual conduct by the parties involved, as was done in *Halford, Schoenhard* and *Bramson.* Nevertheless, the court in *Halford* relied on circumstantial evidence to establish that there was a continuing conjugal relationship. That evidence included testimony that the couple shared the same bedroom, notwithstanding their testimony to the contrary, that the couple did not date anyone else and that they were openly affectionate toward each other. The testimony in *Halford* was provided by persons who knew the couple well and did not involve or necessitate intrusions into the privacy of the couple's bedroom. Petitioner

here has produced no evidence, either direct or circumstantial, that would indicate a conjugal relationship. Petitioner having failed to establish the elements of his claim, the trial court properly denied termination of maintenance under section 510(b).

For the foregoing reasons, the judgment of the circuit court denying termination or modification of maintenance is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.