396

*In re* MARRIAGE OF WARREN ARTHUR SAPPINGTON, Petitioner-Appellant, and ANNA MARIE SAPPINGTON, Respondent-Appellee.

Fourth District   No. 4—82—0813

Opinion filed April 9, 1984.

BARRY, J., dissenting.

Charles J. Gramlich, of Gramlich and Morse, of Springfield, for appellant.

Edward Booth, of Greanias & Booth, of Decatur, for appellee.

JUSTICE STOUDER delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Sangamon County which declined to terminate the maintenance payments which plaintiff Warren Sappington was making to his former wife, Anna Marie Sappington.

After 30 years of marriage a judgment dissolving the marriage of the parties was entered on January 26, 1979. The judgment incorporated the separation agreement providing the plaintiff, Warren Sappington, pay monthly maintenance to Anna Marie Sappington, defendant, of $750. In October 1981, the plaintiff endeavored to terminate the maintenance payments under section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 510(b)), because the defendant was cohabitating with Lyle Montgomery on a resident, conjugal basis. Several hearings were held at which 11 witnesses testified. The evidence tended to show that Lyle "Archie" Montgomery has lived with Anna Marie since November 1979. The house which Anna Marie and Lyle occupy is the former marital residence of Warren and Anna Marie. It is a two-story house

with three rooms and a bath on the second floor. Lyle Montgomery has access to the whole house. He helps mow the lawn, rakes leaves, patches the roof, fixes faucets and performs general maintenance about the house and has been doing those things since he has been there. He takes his meals there and sometimes takes his meals with Mrs. Sappington, who also cooks for him. She does his dishes and some of his laundry. He has his clothing there. He goes out socially with Anna Marie in addition to going to church with her. After church, Anna Marie and Lyle often eat at Bishop's, a restaurant in Decatur. Lyle and Anna Marie have been many places together, including, but not limited to, Fairview Park, Republican Club, Blue Mill Restaurant, and Springfield, Illinois. They have taken two vacations to Florida together. While traveling to and from Florida, they occupied the same motel room and while they were in Florida, on each occasion they occupied the same room. He denied having a formal arrangement for the payment of expenses, but he maintained that he does pay for the privilege of living with Anna Marie. He says he pays part of the utilities and the paper boy in addition to bringing in food. They often shop for food and share expenses. He says he originally moved in to afford her protection. She was afraid of staying alone. They exchange gifts at Christmas and on birthdays. They commingle foods.

According to Lyle Montgomery, he has no interest in women and has been impotent for three or four years. He admitted, however, that he made no complaint about impotency until after the petition to terminate maintenance had been filed. It also appeared that Anna Marie took care of her own business affairs, had her own bank accounts in her name only and had not included Lyle in her will. According to her testimony, Lyle paid rent and attended social functions with her as a friend. Anna Marie and Lyle each denied having any sexual interest in the other and denied any sexual conduct toward the other, claiming instead their relationship was solely that of friends.

The court denied the request to terminate maintenance payments and this appeal follows.

This case involved the interpretation and application of section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 510(b)) which, in pertinent parts, provides:

> "Unless otherwise agreed by the parties in a written separation agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage

of the party receiving maintenance, or if the party receiving maintenance, cohabits with another person on a resident, continuing conjugal basis."

On this appeal the plaintiff argues the term "conjugal" as used in the statute does not necessarily include sexual intercourse in the usual manner. Although stated as a separate issue, the plaintiff further argues that since sexual intercourse is not a necessary element of cohabitation on a conjugal basis, impotency does not prevent the application of the statutory terminating conditions.

The statute under consideration is of fairly recent vintage and has no antecedents which might afford some well-established meanings for the terms employed. In common and everyday parlance many of our expressions about marriage and sex are vague euphemisms. As is pointed out in the briefs, there are no committee comments regarding this section of the statute, so that in determining the intention of the legislature we do not have the benefit of any contemporaneous exposition.

According to *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469, the addition to the statute terminating the recipient's right to receive maintenance was enacted in response to the holding in *Atwater v. Atwater* (1974), 18 Ill. App. 3d 202, 309 N.E.2d 632. In *Atwater* the court held since Illinois does not recognize common law marriages, such a marriage by an alimony recipient did not terminate the right to receive alimony.

The plaintiff has directed our attention to several definitions of "conjugal" in support of his contention that neither a sexual relationship nor sexual intercourse is an essential element of the definition of the term. For example, Webster's Third New International Dictionary defines conjugal "of or relating to marriage, the married state or married persons in their mutual relations; matrimonial; connubial." From the failure of this definition and other similar definitions to include any mention of sex, sexual relationship or sexual intercourse, the plaintiff concludes that the sexual relationship is not an element of the conjugal relationship or conversely that the relationship can have a conjugal basis even though there is an absence of any sexual relationship. However, not cited by the plaintiff is the definition in Webster's Third New International Dictionary of the term "conjugal rights" which are defined as "the sexual rights or privileges implied by and involved in the marriage relationship; the right of sexual intercourse between husband and wife." From the latter definition it would appear that "conjugal" refers primarily to the sexual relationship between parties.

According to *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469, *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 392 N.E.2d 764, and *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 388 N.E.2d 1131, cohabiting on a residential continuing conjugal basis refers to the equivalent of a husband and wife relationship absent the legal formalization. While such a relationship may be subject to variation, the commonly accepted characterization of husband and wife does have a sexual component or basis. We believe that parties living together on a conjugal basis as described in the statute necessarily includes a sexual relationship. This view is supported by *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 405 N.E.2d 1156, which plaintiff believes was wrongly decided. However, we are not inclined to depart from our holding in *McGowan* and the cases cited therein.

The trial court in its order found, "There is no evidence of sexual intercourse between Anna Marie Sappington and Lyle Montgomery, nor does the evidence show any indication of attraction between them tending toward the establishment of a sexual relationship."

Since the trial court found there was no sexual relationship between Anna Marie and Lyle, an essential element of a conjugal relationship, we find it unnecessary to decide in this opinion the nature and characteristics of a sexual relationship sufficient to meet the statutory condition.

The plaintiff has also argued that the evidence does establish a conjugal basis for the relationship between Anna Marie and Lyle, notwithstanding the trial court's conclusion to the contrary. We disagree.

As a general rule, circumstantial evidence will suffice and specific eyewitness testimony will seldom be available. Nevertheless, after examining the evidence in some detail, we do not believe the trial court's findings of fact are against the manifest weight of the evidence.

For the foregoing reasons the judgment of the circuit court of Sangamon County is affirmed.

Judgment affirmed.

ALLOY, P.J., concurs.

JUSTICE BARRY, dissenting:

I agree that the trial judge's findings of fact do not appear to be against the manifest weight of the evidence. He indicated that he felt compelled and bound, and properly so, to follow the appellate case

law in Illinois which interpreted section 510(b) to require proof of acts of sexual intercourse or the right to sexual intercourse. However, while refusing to terminate maintenance, the trial court found that Mr. Montgomery was not the renter that he and Mrs. Sappington claimed he was, and the trial court invited an appeal of his decision.

While I must admit that the presence or absence of sex is certainly relevant and material, I disagree with the majority holding that parties living together on a conjugal basis necessarily includes a sexual relationship between them. I am compelled therefore to consider all three of the appellant's issues, which are:

(1) Whether the word "conjugal" as used in subsection (b) of section 510 necessarily includes sexual intercourse as classically defined;

(2) Whether an impotent male is capable of a conjugal relationship;

(3) Whether the finding of the trial court that a conjugal relationship did not exist is against the manifest weight of evidence.

I would rule that a conjugal relationship does not necessarily include sexual intercourse; that a male, if impotent, is capable of a conjugal relationship; and that the trial court did err in finding that a conjugal relationship did not exist.

The record reveals that Mrs. Sappington and Mr. Montgomery were older divorced adults without any family obligations, they had met some 12 years before, they attended singles dances subsequent to their divorces on some 20 occasions, they danced together, and ultimately Mr. Montgomery commenced residing in the marital residence acquired by Mrs. Sappington as part of her property settlement when she divorced. Mr. Montgomery took over use of the master bedroom and the two have lived there alone since, that is, for more than two years. Mrs. Sappington testified that she charged Mr. Montgomery $120 per month rent, but that she did not declare this amount as rental income on her income tax returns. Mr. Montgomery testified that there was no formal arrangement but that he paid in cash as necessary whenever bills came in. The record reflects their social activity together was unlimited and that there was no evidence of any intention of terminating the living arrangement. It appears that they did everything together as would a husband and wife, openly, and that in effect Mr. Montgomery replaced Mrs. Sappington's former husband in and about the household. However, it appears they handled their own limited business affairs separately, and that neither is openly affectionate. (Mrs. Sappington's daughter verified the latter about her

mother.) Mrs. Sappington indicates that she enjoys social activity with female acquaintances outside the home, but both Mr. Montgomery and Mrs. Sappington admit that they do not date or socialize otherwise, except with each other. While admitting that they get along very well, they both testified, in opposition to any living arrangement, sexual relationship inference, that they have never slept in the same bed, even when occupying the same sleeping rooms to and from and while in Florida on vacations.

Though a sexual relationship and affection for each other was denied, every facet of a relationship necessary to circumstantially establish that sexual intercourse occurred was proved. Certainly sleeping in the same house for several years and in the same motel and vacation sleeping rooms necessitates a conclusion of a "conjugal" relationship beyond a mere platonic, pristine cohabitation of friends. (The evidence would be sufficient to prove adultery. See *Cuneo v. Cuneo* (1980), 80 Ill. App. 3d 141, 399 N.E.2d 1384.)

From this we can conclude that Mrs. Sappington and Mr. Montgomery established an ongoing relationship of "[cohabiting] with [each other] on a resident, continuing *** basis." And, clearly there has been a substantial change in circumstances from those of Mrs. Sappington at the time of her divorce.

It is axiomatic that "the legislative branch in the exercise of its traditional authority [declares] public policy in the domestic relations field." (*Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 61, 394 N.E.2d 1204, 1209.) Our resolution of the issues therefore turns upon the legislative intent by using the word "conjugal" with "continuing." The only legislative history of section 510(b) herein involved is that it was passed by the legislature in 1977 and that it parrotted in part section 316(b) of the Uniform Marriage and Divorce Act, which Uniform Act reads:

> "(b) *Unless otherwise agreed in writing or expressly provided in the decree*, the obligation to pay future maintenance is terminated upon [*1*] the death of either party or [*2*] the remarriage of the party receiving maintenance." (Emphasis added.) (9A Uniform Laws Annotated 183 (1979).)

Section 510(b) as then enacted (and section 510(b) at the time the subject petition was filed in October of 1981), however did not include the emphasized introductory clause of the Uniform Act. Obviously it did not include the third terminating event involved in the instant case. The Illinois legislature then chose to mandate the third terminating event by adding: "[O]r if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." Ill. Rev. Stat. 1979, ch. 40, par. 510(b).

Firstly, it should be recognized that the elimination of the introductory clause attained the object of making terminating events mandatory. Secondly, as Justice Stouder in *Ihle v. Ihle* (1981), 92 Ill. App. 3d 893, 416 N.E.2d 366, and Justice O'Connor in *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469, have observed, the purpose of the inclusion of the "resident continuing conjugal cohabiting" terminating event was intended to reverse prior law which permitted maintenance payments to continue even though the recipient spouse had entered into a husband-and-wife-like relationship with another. While doing so it should be noted that the legislature did not repeal the statute against contracting common law marriages in Illinois. Nor did the legislature repeal the Illinois law which makes fornication a misdemeanor.

Exactly what did the legislature mean by including the word "conjugal" in section 510(b)? Black's Law Fourth and Webster's Third New International Dictionary definitions of "conjugal" are as follows:

> "Of or belonging to marriage or the married state; suitable or appropriate to the married state or to married persons; matrimonial; connubial. Swanson v. Swanson, 20 A.2d 617, 618, 128 Conn. 128, 135 A.L.R. 349." (Black's Law Dictionary 374 (4th ed. 1951).)

> "1: of or relating to marriage, the married state, or married persons in their mutual relations; MATRIMONIAL, CONNUBIAL ***

> 2: consisting of or based on the husband, wife, and their offspring as constituting the functional familial unit in a society *** contrasted with *consanguine*, compare FAMILY—con-ju-gal-i-ty." (Webster's Third New International Dictionary 480 (1976).)

Black's definition of "Conjugal rights" is as follows:

> "Matrimonial rights; the right which husband and wife have to each other's society, comfort, and affection." Black's Law Dictionary 374 (4th ed. 1951).

Though I take issue with defining conjugal in the context of "rights," as does the majority, even Black's definition of "conjugal rights" limits the rights to a *de jure* marriage state, and it is also noteworthy that the definition does not include the word "sex," nor does it include the right to sex. (Certainly there is no right whatsoever to sex outside of a *de jure* marriage.)

The above-recited modern recognized definitions of "conjugal" obviously assume only the *de jure* marital state. Our chore is to determine what the legislature meant by "conjugal" in a nonmarital set-

ting for the purpose of adding another mandated automatically enforceable right to terminate maintenance. By adding the word conjugal the legislature meant to define something other than holding out as a husband and wife (as in a common law marriage), or something other than an open and notorious sexual relationship (as fornication). Obviously the legislature meant something less than a *de jure* marriage, and did not choose to use the term *"de facto."*

Dr. Carol Moy, a professor of psychiatry and family practice at Southern Illinois University School of Medicine in Springfield, testified at the trial in this case. She counsels couples who are dissatisfied with their relationships and assists people in developing a conjugal relationship, including males who are impotent. She indicated that penile penetration is not the only form of sexual intercourse, that there are verbal and nonverbal ways of expressing sexuality. While indicating that a conjugal relationship does not necessarily involve sexual intercourse or sexual gratification, she defined a conjugal relationship as "a total family relationship *** between a male and a female [is] usually understood to be a relationship of two people living, functioning together in a mutually supportive atmosphere."

The case law interpretations of the third terminating event of section 510(b) were commenced in the Illinois Appellate Court in April of 1979. They are:

> *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 388 N.E.2d 1131;
>
> *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 392 N.E.2d 764;
>
> *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 404 N.E.2d 469;
>
> *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 405 N.E.2d 1156;
>
> *In re Marriage of Olson* (1981), 98 Ill. App. 3d 316, 424 N.E.2d 386;
>
> *In re Marriage of Cohenour* (1981), 101 Ill. App. 3d 362, 428 N.E.2d 195;
>
> *In re Marriage of Clark* (1983), 111 Ill. App. 3d 960, 444 N.E.2d 1369.

Except for *Cohenour* all involved short term or non-live-in or admitted sexual relationships. *Cohenour* is the only factually similar case.

In *Cohenour*, as here, we found that the maintenance recipient claimed physical impairment and did not seek employment. Like Mr. Montgomery, Mr. Escabedo in *Cohenour* contributed dollars rather freely to the Cohenour household expenses, and denied sexual activity

with Mrs. Cohenour, which was verified by Mrs. Cohenour's resident son, who was unfriendly to Mr. Escabedo. Mr. Escabedo also indicated that he had his own sleeping accommodation in the house, for a time in a basement room, and thereafter in the room relinquished by Mrs. Cohenour's son. However, unlike the instant case, it does not appear that Mrs. Cohenour and Escabedo socialized together on an unlimited basis as here, nor did they vacation together. They of course denied any sexual relationship. In approving the trial court's refusal to terminate maintenance we held that continuing sexual intercourse must be proved as occurring between the parties before the pertinent provision of section 510(b) is triggered, thereby eliminating the obligation to continue maintenance payments. We said "continuing sexual intercourse must occur between the party receiving maintenance and another party." (*In re Marriage of Cohenour* (1981), 101 Ill. App. 3d 362, 365, 428 N.E.2d 195, 197.) Then we said "[t]he law requires either direct or circumstantial evidence of sexual conduct before maintenance payments can be terminated." (101 Ill. App. 3d 362, 365, 428 N.E.2d 195, 198.) One fallacy of our reasoning in *Cohenour* is apparent. We erroneously equated sexual conduct with sexual intercourse. In addition, the facts presented in the instant case suggests that our ruling in *Cohenour* was overbroad, and though the proper result was reached, I would now state the applicable principles of law more narrowly. In fact, I believe the intent of the legislature has been misinterpreted by our various appellate decisions cited above. I believe there is no justification for equating sexual intercourse with conjugal, without reservation or exception.

Though sexual activity will normally be an element in a conjugal relationship, it would seem that there could be a conjugal relationship without sexual intercourse. Absence of intercourse in a marriage would not make a marriage nonconjugal. I doubt that the legislature contemplated that the consummation of the sex act was necessary to a conjugal relationship. Sexual intercourse as classically defined is sometimes impossible between partners, which we must assume was recognized by the legislature. Though the element of sex is certainly a factor to be considered, by my view it is not an essential ingredient and should not be a controlling factor. Whether partners avail themselves of the sexual aspect of cohabitation is a private matter in our society. Unless a crime is involved, the sexual activity need not be disclosed, and most times is not. (For that reason such conduct in a setting such as here is no more susceptible to direct, positive evidence than is adultery.) However, in the words of the appellant "like it or not Illinois is relatively straight-laced." In Illinois when the public is

even only indirectly affected the public policy in the domestic relations field is to condemn the activity. As I have heretofore indicated, fornication is a crime when the behavior is open and notorious, common law marriages are barred by statute, in 1977 the Illinois legislature added the additional maintenance terminating event here involved, and our supreme court, through Justice Underwood, while denying a "common law" wife's claims, which were considered to perhaps be meritorious, said, "There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships." (*Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 58, 394 N.E.2d 1204, 1207.) Obviously Illinois has a strong public policy in favor of encouraging marriage and regenerating morality, and it appears that the pertinent provision of section 510(b) is consistent with the public policy of Illinois which disfavors the creation of or continuation of rights which enhance nonmarital relationships. *Hewitt.*

Given what appears to be a rather clearly defined mandate and purpose to terminate future maintenance whenever the receiving spouse enters into a husband-wife-like relationship, and in view of the public policy as expressed by our supreme court and our statutory law, having carefully considered all of the evidence and circumstances, I would rule in favor of terminating maintenance here.

I would hold that when two parties, usually of the opposite sex, who are not closely related, reside together continuously for an extended period of time, pursuing life and functioning together, sharing financial and household responsibilities, in a warm, intimate, mutually supportive atmosphere, tantamount to that of husband and wife, then the relationship is presumed to be "[cohabitation] with another person on a resident, continuing conjugal basis," whether sexual conduct is evidenced or desired.

Though *stare decises* would normally compel me to concur, I must dissent and depart from former opinions for the reasons indicated.