(No. 60144.—

*In re* MARRIAGE OF WARREN ARTHUR SAP-PINGTON, Appellant, and ANNA MARIE SAP-PINGTON, Appellee.

*Opinion filed April 19, 1985.—Rehearing denied May 31, 1985.*

Charles J. Gramlich and Eric A. Artman, of Gramlich & Morse, of Springfield, for appellant.

Edward Booth, of Greanias & Booth, of Decatur, for appellee.

CHIEF JUSTICE CLARK delivered the opinion of the court:

On January 26, 1979, a judgment was entered in the circuit court of Sangamon County dissolving the 30-year marriage of plaintiff, Warren Arthur Sappington, and the defendant, Anna Marie Sappington. The judgment incorporated a separation agreement which provided that plaintiff was to pay defendant $750 per month in

maintenance payments. In October of 1981, plaintiff sought to terminate the maintenance payments under section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par. 510(b)), because he alleged that defendant was cohabiting with Mr. Lyle Montgomery on a "resident, continuing conjugal basis." Montgomery alleged that he is impotent. The circuit court held that section 510(b) requires proof of acts of sexual intercourse or the right to sexual intercourse and since there was no evidence of sexual intercourse or any indication of attraction between defendant and Montgomery tending toward the establishment of a sexual relationship, he denied plaintiff's request to terminate maintenance payments. Plaintiff appealed to the appellate court. The appellate court, in a divided opinion, affirmed the circuit court. (123 Ill. App. 3d 396.) The appellate court held that a sexual relationship was an essential element of a conjugal relationship as contemplated by section 510(b). (123 Ill. App. 3d 396, 399.) It also held that since the trial judge's finding that there was no sexual relationship between the defendant and Montgomery was not against the manifest weight of the evidence, the trial judge had not erred in denying plaintiff's request to terminate maintenance. In a lengthy dissent, the dissenting justice stated that the majority had erred in finding that a conjugal relationship necessarily includes sexual intercourse, that he believed an impotent male was capable of a conjugal relationship and that the trial court had erred in finding that a conjugal relationship did not exist in this case. 123 Ill. App. 3d 396, 400 (Barry, J., dissenting).

The record reveals that defendant and Montgomery had known each other for 12 years. Subsequent to both of their respective divorces, they attended approximately 20 singles dances and danced together on occasion. Thereafter, Montgomery began living in the Sap-

pington's former marital residence, which was acquired by defendant as part of her property settlement. The home has two stories. On the upper level, there is a master bedroom, a second bedroom, a room with a television which has also been used to sleep in, and a bathroom. Montgomery began occupying the master bedroom, and he and the defendant have lived in the home alone now for more than two years. The defendant alleged that she occupies the second bedroom or the room with the television. There is no evidence in the record of any intention to terminate their present living arrangement.

Defendant testified that she charged Montgomery $120 per month for rent but stated that she did not declare this money as rental income on her tax returns. Montgomery testified that there was no formal arrangement for rent but that he paid in cash as necessary when household bills had to be paid. He testified that he pays part of the utility bills, to have the paper delivered, and for the food he brings in himself.

The evidence shows that Montgomery has free access to the entire house. He has performed general maintenance jobs in and around the house since he moved in. He helps mow the lawn and rake the leaves. He has also assisted in patching the roof and has fixed a leaky faucet.

Montgomery eats his meals at the home, sometimes eating with the defendant, who cooks for them and then does their dishes. Defendant also does some of Montgomery's laundry.

Defendant and Montgomery often go out together socially. They go to church and eat afterwards at Bishop's, a restaurant in Decatur. They have gone many places together, including Fairview Park, the Republican Club, the Blue Mill Restaurant, and to Springfield, Illinois. They have taken two vacations to Florida together. On each trip, they occupied the same motel room while trav-

eling to and from Florida and while vacationing in Florida.

Montgomery testified that the reason he moved in with defendant was to afford her protection because she was afraid of staying alone. On their birthdays and at Christmas defendant and Montgomery exchange gifts.

The record reflects the fact that both defendant and Montgomery handle their own limited business affairs. Defendant testified that she has her own bank accounts and that Montgomery is not named in her will. The Sappingtons' daughter testified that her mother and Montgomery are not openly affectionate with one another. However, she also testified that she would not characterize her mother as an affectionate person in the outward physical sense.

Although defendant testified that she enjoys social activity with female acquaintances outside of her home, both Montgomery and defendant stated that they do not date or socialize other than with each other. They both testified that they have never slept in the same bed, even while occupying the same motel room in transit to and from Florida and while vacationing in Florida.

Montgomery testified that he has no interest in women and that he has been impotent for three or four years. He did state, however, that he had not told his doctor about his impotency until after he had received a subpoena to testify in this case. Dr. Barton, Montgomery's physician, testified that, based on what Montgomery told him, he would say that Montgomery was impotent. However, he stated that there is no objective medical test to establish impotency.

Both defendant and Montgomery denied having any sexual interest in each other and denied any sexual conduct toward each other; they maintain that their relationship is just that of friends.

This appeal involves the interpretation and applica-

tion of section 510(b) of the Illinois Marriage and Disso-
lution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, par.
510(b)), which provides in pertinent part:

> "Unless otherwise agreed by the parties in a written
> separation agreement set forth in the judgment or other-
> wise approved by the court, the obligation to pay future
> maintenance is terminated upon the death of either party,
> or the remarriage of the party receiving maintenance, or
> if the party receiving maintenance, *cohabits with another
> person on a resident, continuing conjugal basis."* (Empha-
> sis added.)

The fact that the defendant and Montgomery cohabit
on a resident, continuing basis is not in dispute. How-
ever, plaintiff argues three points on appeal before this
court: (1) that the term "conjugal" as used in section
510(b) does not necessarily require sexual intercourse; (2)
that an impotent male is capable of a conjugal relation-
ship; and (3) that the trial court's finding that a conjugal
relationship did not exist in this case is against the mani-
fest weight of the evidence.

The first issue we will address is whether the term
"conjugal" as used in section 510(b) necessarily requires
that the parties engage in sexual intercourse or sexual
conduct. We do not believe it does. We believe that a re-
lationship can have a conjugal basis even though there is
an absence of any sexual relationship.

The term "conjugal," as plaintiff correctly maintains,
is not defined in terms of a sexual relationship. Black's
Law Dictionary, for example, defines "conjugal" as "[o]f
or belonging to marriage or the married state; suitable
or appropriate to the married state or to married per-
sons; matrimonial; connubial." (Black's Law Dictionary
374 (4th ed. 1978).) Black's Law Dictionary also defines
"conjugal rights" as "[m]atrimonial rights; the right
which husband and wife have to each other's society,
comfort and affection." (Black's Law Dictionary 374 (4th

ed. 1978).) In the appellate court, the majority noted that, while Webster's Third New International Dictionary defines the term conjugal exactly as Black's Law Dictionary does, Webster's Dictionary defines "conjugal rights" differently. Webster's Dictionary defines "conjugal rights" as "the sexual rights or privileges implied by and involved in the marriage relationship: the right of sexual intercourse between husband and wife." (Webster's Third New International Dictionary 480 (1971).) We do not believe that, because "conjugal rights" as defined in Webster's Dictionary includes a sexual aspect, it necessarily follows that the legislature intended the term "conjugal," standing by itself in section 510(b), to have a sexual connotation or meaning.

Plaintiff's expert, Dr. Carol Moy, a professor of psychiatry and family practice at Sangamon State University School of Medicine, testified that she assists people in developing conjugal relationships, including males who are impotent. She stated that a conjugal relationship does not necessarily require sexual intercourse, that penile penetration is not the only form of sexual intercourse, and that there are verbal and nonverbal ways of expressing sexuality. She defined a conjugal relationship as "a total family relationship *** between a male and a female; [it is] usually understood to be a relationship between two people living, functioning together in a mutually supportive atmosphere."

There have been seven appellate court cases in which section 510(b) has been previously interpreted and applied. They are: *In re Marriage of Clark* (1983), 111 Ill. App. 3d 960; *In re Marriage of Cohenour* (1981), 101 Ill. App. 3d 362; *In re Marriage of Olson* (1981), 98 Ill. App. 3d 316; *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609; *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657; *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296; *In re Support of Halford* (1979), 70 Ill. App. 3d

609. However, this is a case of first impression in this court. Although we may be persuaded by the reasoning of the appellate court in these cases, contrary to defendant's assertion, we are not bound by these decisions. We agree with the appellate court in these cases to the extent that the presence or absence of sexual conduct may be a factor to be considered in determining whether a conjugal relationship exists; however, we do not believe that parties cohabiting on a conjugal basis must necessarily engage in sexual conduct. If to avoid the application of this section all that a person had to do was to claim impotency or deny any sexual relations, then the purpose of this statute could easily be defeated.

Defendant argues that by defining conjugal as nonsexual, the term becomes synonymous with cohabitation. "Cohabitation" is defined in Black's Law Dictionary as "[d]welling together"; "Intercourse together as husband and wife"; "Living, or abiding or residing together as man and wife." (Black's Law Dictionary 326 (4th ed. 1978).) Were we to take defendant's argument to its logical conclusion, we would have to hold that her suggested interpretation of "conjugal" as including sexual intercourse makes "conjugal" synonymous with the term "cohabitation" as defined in Black's Law Dictionary. Instead, we believe that the legislature intended the term "cohabitation" to have the general meaning of living or dwelling together and intended conjugal to be interpreted as of or belonging to marriage or the married state.

The first case in which section 510(b) and the term "conjugal" were discussed was *In re Support of Halford* (1979), 70 Ill. App. 3d 609. In that case, Mrs. Halford admitted having sexual intercourse with Mr. Green, the person who was living in her home. However, the circuit court denied the petition for termination of alimony because it found that the evidence failed to establish that

the conjugal relationship in that case was one of a continuing nature. The appellate court reversed, holding:

"Since Green was living in Mrs. Halford's home at the time of the trial and had been doing so for over three years, we may only conclude that the circuit court felt that the evidence was insufficient to establish the continuing nature of their conjugal relationship because Mrs. Halford admitted only to having sexual intercourse with Green four times, with the last instance being in the winter of 1978. If a finding of the continuing nature of a conjugal relationship could be avoided by such a simple admission, this statute's purpose could never be achieved. Were sexual intercourse the only element necessary to permit termination, the frequency with which the act is performed would be of greater importance. However, where as here, the couple must also be cohabiting on a resident and continuing basis, proof of the occurrence of sexual intercourse over the time period rather than proof of its frequency is of primary importance. This is especially true since couples engaging in sexual intercourse rarely do so in a manner which subjects them to public view. For this reason, direct evidence of intercourse and its frequency will seldom be available. Consequently, circumstantial evidence and reasonable inferences must play an important role in this type of termination case." 70 Ill. App. 3d 609, 613-14.

The other appellate court cases, with the exception of *In re Marriage of Cohenour* (1981), 101 Ill. App. 3d 362, all involved either admitted sexual conduct, nonresidence, or short-term relationships. In *Cohenour*, as in the instant case, the defendant and the person living in her home denied that they had ever engaged in sexual intercourse. The *Cohenour* court held:

"In the instant case there is no direct evidence whatsoever of sexual conduct between LeRae [the ex-wife] and Escobedo [the person residing in her home]. There is no evidence of any display of affection between the parties. They apparently did not dine out together or travel together. The sole party who possibly could have shed any

light on their relationship was LeRae's son Jeff. Even though he and Escobedo had a quarrel of a nature serious enough to result in Jeff leaving the home, he testified that he had never seen any improprieties between his mother and Escobedo while living in the home. The law requires either direct or circumstantial evidence of sexual conduct before maintenance payments can be terminated. See *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 405 N.E. 2d 1156." 101 Ill. App. 3d 362, 365.

We believe the *Cohenour* case, although it is more factually similar to the instant case than any of the other appellate court cases, is clearly distinguishable from the instant case. In *Cohenour,* there was no evidence of a husband-and-wife-like relationship. The parties did not go out together socially or travel together. There was also evidence that Escobedo made regular payments to stay at the house, unlike Montgomery in the instant case. Although the defendant and Montgomery have denied a sexual relationship or any affection for each other, Montgomery and the defendant did many things together. In effect, Montgomery took the place of the plaintiff in and around the household. The evidence shows that the defendant and Montgomery have lived in the same house alone for more than two years, they have gone out together exclusively, and they have taken vacations together sharing the same motel room and expenses. We believe that the record indicates that their relationship is more husband-and-wife-like than would be a relationship between casual friends.

In each of the cases where termination of maintenance is sought under section 510(b), there will be a unique set of facts. No two cases in this area will be alike because no two personal relationships are alike. If the legislature had intended "conjugal" to be "sexual," it could have used the word sexual, but it did not. For example, in section 301(2) of the Illinois Marriage and

Dissolution of Marriage Act, as the plaintiff points out, the legislature specifically used the words "sexual intercourse." (Ill. Rev. Stat. 1983, ch. 40, par. 301(2).) To the extent that the appellate court cases previously cited and any other case dealing with this issue hold that a conjugal relationship necessarily requires sexual intercourse or sexual conduct, they are incorrect and are not to be followed.

Maintenance is predicated upon a need for support by the spouse who is to receive maintenance (Ill. Rev. Stat. 1983, ch. 40, par. 504). We believe that when two people live together, like the defendant and Montgomery, it is the husband-and-wife-like relationship which bears the rational relationship to the need for support, not the absence or presence of sexual intercourse. Therefore, once an ex-spouse paying maintenance has demonstrated that a husband-and-wife-like relationship does exist, it should be encumbent upon the maintenance recipient to demonstrate that the relationship in which he or she is engaged is not the type of relationship which was intended by the legislature to justify the termination of the obligation to pay maintenance. In *Halford*, the court held:

> "We believe that it was the intention of our legislature to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means." (70 Ill. App. 3d 609, 612.)

In *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, the court stated:

> "Moreover, the legislative intent does not appear to be an attempt to control public morals. *** Rather, an important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either

received support from her co-resident or used maintenance monies to support him."

In the instant case, at the close of the plaintiff's case, the defendant made a motion for judgment. The trial judge, in denying the motion, found:

"The evidence proved for a period of approximately two years Respondent [Mrs. Sappington] has cohabited with Lyle A. Montgomery on a rent [sic] continuing basis. Petitioner [Mr. Sappington] was unable to prove any sexual activity between Respondent and Mr. Montgomery. Both Respondent and Mr. Montgomery deny that there has been any such sexual activity. Mr. Montgomery claims to be impotent.

\* \* \*

The court finds that while sexual activity between Mr. Montgomery and Respondent has not been proven in this cause, Mr. Montgomery is something entirely different than the rentor that he and the Respondent claim him to be. The Court finds that Section 510(b) of the Illinois Marriage and Marriage Dissolution Act should and does apply to the living arrangement such as that of Respondent and Mr. Montgomery."

At the close of all the evidence in this case, the trial judge entered judgment in favor of the defendant and found:

"This statute requires proof of acts of sexual intercourse or the right to sexual intercourse between a male and female cohabiting continuously together. The record of this case contains no evidence of sexual intercourse between Mrs. Sappington and Mr. Montgomery nor does it show any indication of attraction between them tending toward the establishment of a sexual relationship."

We now hold that the trial judge's finding that a conjugal relationship requires proof of sexual intercourse or sexual conduct is erroneous. We also hold that since a conjugal relationship does not require sexual conduct, an impotent male is capable of a conjugal relationship. We further hold that while the trial judge's finding that a

sexual relationship did not exist in this case is not against the manifest weight of the evidence, his finding that a conjugal relationship did not exist in this case is against the manifest weight of the evidence.

For the foregoing reasons, we reverse the circuit and appellate courts and remand this cause to the circuit court so that an order terminating the plaintiff's obligation to pay maintenance payments may be entered.

*Reversed and remanded,*
*with directions.*

JUSTICE MILLER took no part in the consideration or decision of this case.

JUSTICE GOLDENHERSH, dissenting:

I dissent. Although I agree with the majority that there can be a conjugal relationship without sexual intercourse, I do not agree that the circuit court's finding that there was no conjugal relationship here was contrary to the manifest weight of the evidence.

I agree with the majority that "[i]n each of the cases where termination of maintenance is sought under section 510(b), there will be a unique set of facts. No two cases in this area will be alike because no two personal relationships are alike." (106 Ill. 2d at 466.) I fail to see, however, how a relationship utterly devoid of any evidence of affection or physical attraction can be found to be conjugal in nature within the contemplation of section 510(b).

The evidence is undisputed that Mr. Montgomery is impotent, that he and Mrs. Sappington, although they did on a couple of occasions occupy the same room, have never slept in the same bed, have never kissed or engaged in any other activity which might be associated with a display of affection or a conjugal relationship. Although the extent of his contribution cannot be deter-

mined from the record, it does appear that they both bought groceries and that they shared utility bills. The testimony shows that they did not regularly share the evening meal and ordinarily did not have dinner together more than two or three times in any week. Mrs. Sappington testified that she would not refuse to go out with other men if she were asked. The testimony shows that Mrs. Sappington prepared a will which contained no provision for Mr. Montgomery and that she goes out socially 15 or 20 times a month, social occasions in which he is not included. There is no testimony whatsoever to indicate that they have mutual friends.

The majority states that the parties exchanged gifts. The testimony shows that the gift to Mr. Montgomery was usually something like a belt or a necktie and that he could not recall whether he had bought her a birthday gift on her last birthday.

The majority states that "[i]n effect, Montgomery took the place of the plaintiff in and around the household." (106 Ill. 2d at 466.) It would not be overly cynical to suggest that if, by the activities shown by the evidence, Montgomery effectively took plaintiff's place around the household, it is not surprising that the parties were divorced.

Obviously the establishment of a conjugal relationship is a matter of intent. As noted by the majority, the term "conjugal" means matters belonging to or suitable or appropriate to the marriage state. A conjugal relationship which includes sexual intercourse does not cease to be conjugal because one of the parties become impotent, and there is, of course, no impediment to an impotent individual's entering into a conjugal relationship. It requires, however, more than is shown by this record which, I reiterate, is utterly devoid of any evidence of any degree of affection between the parties or any degree of attraction which could lead to a sexual relation-

ship. Despite its discussion of the definitions of "conjugal" (106 Ill. 2d at 462-63) and "cohabitation" (106 Ill. 2d at 464), the majority has given them the same definition.

The circuit court found that there was no conjugal relationship between the parties because there was no evidence of a sexual relationship. We have repeatedly held that if a circuit court judgment is correct, it should be affirmed, even though the reason given for the judgment may be erroneous. Based on this record, the circuit court reached the correct conclusion, and its finding is not against the manifest weight of the evidence. I would affirm the judgments of the circuit and appellate courts.

JUSTICE SIMON, also dissenting:

While I join Justice Goldenhersh's disagreement with the majority's decision to terminate the plaintiff's obligation to pay maintenance, I believe that the statute requires proof of sexual intercourse and that any change in the meaning of "conjugal basis" as used in the statute must be adopted by the legislature. In 1977, the General Assembly passed the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*). Section 510(b), which was enacted at the time the Act was first passed, required a showing of a conjugal relationship in order to terminate maintenance payments. (Ill. Rev. Stat. 1977, ch. 40, par. 510(b).) In 1982, the legislature amended portions of section 510(b) but did not change the conjugal-basis requirement.

From 1977 until the amendment of the statute in 1982, the appellate court interpreted section 510(b) on six occasions. (See *In re Support of Halford* (1979), 70 Ill. App. 3d 609; *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296; *In re Marriage of McGowan* (1980), 84

Ill. App. 3d 609; *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657; *In re Marriage of Olson* (1981), 98 Ill. App. 3d 316; *In re Marriage of Cohenour* (1981), 101 Ill. App. 3d 362.) In each of those cases, the appellate court held that the term "conjugal basis" as used in the 1977 version of the statute required a showing of sexual intercourse. The legislature, then, had a clear indication of the court's interpretation of the meaning of "conjugal basis" when it amended section 510(b) in 1982. Because those amendments did not change the "conjugal basis" requirement, I must conclude that the legislature intended to continue the requirement of sexual intercourse. Otherwise, it would have clarified that portion of the statute along with the other changes it made.

This conclusion is dictated by both sound reasoning and principles of statutory interpretation this court has traditionally followed. In *Hupp v. Gray* (1978), 73 Ill. 2d 78, 85-86, for example, this court said:

"[W]e must recognize that a reenacted statute will be given the same construction as that given the prior act, since the legislature is presumed to know the construction which has been given to the statute and, by reenactment, is assumed to have intended for the new statute to have the same effect. (*City of Champaign v. City of Champaign Township* (1959), 16 Ill. 2d 58.) Thus, an amendatory act is not only to be construed as continuing in effect the unchanged portions thereof (*Gaither v. Lager* (1954), 2 Ill. 2d 293) but, more significantly, if previously construed terms in the unamended sections are used in the amendment, it is generally concluded that the legislature intended to adopt the prior construction given to these terms. 1A Sutherland, Statutes and Statutory Construction sec. 22.35 (4th ed. 1972)."

(See also *Froud v. Celotex Corp.* (1983), 98 Ill. 2d 324, 336; *Stryker v. State Farm Mutual Automobile Insurance Co.* (1978), 74 Ill. 2d 507, 512-13; *Illinois Power Co. v. City of Jacksonville* (1960), 18 Ill. 2d 618, 622;

*Village of Glencoe v. Hurford* (1925), 317 Ill. 203, 217.) The legislature was aware of the court's interpretation of section 510(b). Its decision to amend 510(b) without changing the requirement of a "conjugal basis" reflects its intent to follow the sexual connotation the word "conjugal" had already been given by appellate court decisions. Because of the legislature's action after the numerous appellate court interpretations, the majority is incorrect when it construes the statute to mean that sexual intercourse need not be shown. See Hart & Sachs, *The Legal Process: Basic Problems in the Making and Application of Law* 1381-1417 (tent. ed. 1958).