2026 IL App (2d) 240705
No. 2-24-0705
Order filed June 10, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* MARRIAGE OF
JENNIFER L. OBERWEIS, n/k/a Jennifer L. Hartman,
Petitioner-Appellant and Cross-Appellee,

and

JOSEPH S. OBERWEIS, Respondent-Appellee and Cross-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Bradley P. David, Judge, Presiding.
No. 17-D-1337

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court properly interpreted and applied the relevant terms of the parties' marital settlement agreement. The manifest weight of the evidence supports the court's finding that petitioner was cohabiting and that the relationship demonstrated a *de facto* marriage. This conclusion renders moot respondent's cross-appeal challenging a discovery ruling below. Finally, the court did not abuse its discretion when it denied respondent's motion to modify maintenance. We therefore affirm the court's judgment.

¶ 2    In this postdecree proceeding, petitioner, Jennifer L. Oberweis, n/k/a Jennifer L. Hartman,

appeals from the trial court's declaratory judgment finding in favor of respondent, Joseph S.

Oberweis, and against her. The court found that Jennifer was cohabiting and involved in a *de facto*

marriage, which warranted a reduction of maintenance pursuant to the parties' marital settlement agreement (MSA). Jennifer argues on appeal that the court erred because it utilized an analysis to find cohabitation disparate from the terms in the MSA. On cross-appeal, Joseph argues that the court erred when it allowed Jennifer to redact certain text messages during discovery proceedings and denied his motion to modify maintenance based on a substantial change in his financial circumstances.

¶ 3    We affirm the trial court's declaratory judgment finding in favor of Joseph and against Jennifer. Our decision renders moot Joseph's claim of error regarding the redaction of Jennifer's text messages. We affirm the court's decision to deny Joseph's motion to modify maintenance.

¶ 4                                I. BACKGROUND

¶ 5    Jennifer and Joseph were married on July 21, 2001, and divorced by entry of a judgment for dissolution of marriage incorporating the MSA on May 10, 2018. During the marriage, the parties had five children together. At the time of the divorce, Joseph served as the CEO of Oberweis Dairy, Inc., earning an annual gross income of $475,000. Jennifer was not working at the time of the divorce, but since then has completed a master's degree in social work and is now employed as a hospice social worker, earning a salary of $70,000 per year.

¶ 6    Under the MSA, the parties had agreed to maintenance payments to Jennifer in the amount of $13,000 per month, in addition to 30% of any cash distributions or bonuses received by Joseph. Maintenance payments began on May 6, 2018, and are scheduled to cease on May 6, 2029, "unless terminated prior thereto or modified pursuant to Paragraph 2.9," which states that maintenance "shall be modifiable" pursuant to section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/510 (West 2018)). Paragraph 2.6 of the MSA provides that, "[b]ased on the substantial amount of maintenance paid under this agreement, JOSEPH'S obligation to pay child

support to JENNIFER shall be reserved." Paragraph 2.7 of the MSA states that any income earned by Jennifer "shall not serve as a basis to modify maintenance under Article II of this Agreement."

¶ 7    Pertinent to this appeal, paragraph 2.11 of the MSA begins:

"JENNIFER'S remarriage or cohabitation on a continuing conjugal basis (not a dating relationship but actual physical, residential cohabitation consisting of a combination of households, along with any other factors then existing at law) shall not serve as a terminating event."

¶ 8    The same paragraph of the MSA then provides a formula for modifying the maintenance payments to Jennifer if she were found to cohabit with a new significant other, for example, reducing maintenance "by fifty percent (50%) of [the] cohabitant's highest annual income (on a calendar year basis) during the period that begins on January 1 of the year that includes the date five (5) years prior to the marriage or commencement of cohabitation and including each year thereafter." Paragraph 2.11 also lists a schedule of minimum maintenance payments to be calculated depending on the cohabitant's income.

¶ 9    On October 20, 2021, Joseph filed a motion for declaratory judgment, arguing that Jennifer was cohabiting with her boyfriend, Shawn Hanke, thereby triggering the modification of maintenance in paragraph 2.11 of the MSA. He sought a declaration from the trial court that Jennifer was cohabiting with Hanke, a finding regarding Hanke's income from the previous five years, and an appropriate calculation under the MSA for the modified maintenance payment amount.

¶ 10    On June 16, 2023, Joseph filed a motion to modify maintenance and for other relief. He asserted that a substantial change in circumstances had occurred, wherein his salary had been involuntarily reduced from $429,000 annually to $300,000 annually. He stated in his motion that

he was seeking alternative employment but noted that "there may be a lengthy period of unemployment before [he] is able to find and obtain comparable employment." He sought to terminate the maintenance obligation owed to Jennifer as provided in the MSA and enter a child support obligation pursuant to statutory guidelines. The trial court took Joseph's motion to modify maintenance under advisement pending trial on his motion for declaratory judgment.

¶ 11    This matter proceeded to a three-week intermittent trial on February 5, 2024, wherein Hanke testified regarding his relationship with Jennifer. He met Jennifer in 2017 while playing an online game application. At that time, he resided in Colorado. Hanke first met Jennifer in person in September 2017, when he surprised her in Las Vegas while she was on a trip with a girlfriend. He and Jennifer shared physical intimacy for the first time during that trip.

¶ 12    Hanke began to visit Jennifer in Illinois beginning in March 2018. During his visits with Jennifer, he stayed at her house. He met Jennifer's children in July of 2018 on a camping trip. At that time, he texted and spoke to Jennifer on the phone daily. Hanke returned to visit Jennifer in November 2018, staying with her for about a week. Jennifer visited Hanke in Colorado on New Year's Eve that year. He returned to Illinois to visit Jennifer in April 2019 and celebrated the birthday of one of the parties' children. He stated that it was his custom and practice to celebrate birthdays with the children.

¶ 13    Hanke returned to Illinois in June or July 2019, and he traveled with Jennifer, the children, and Jennifer's mother to Sanibel Island, Florida, for a two-week vacation. Jennifer paid for Hanke's airfare, while Hanke paid for food and some transportation. Jennifer paid for the rental house. He visited Illinois in October 2019 to go trick-or-treating on Halloween with Jennifer and the children and returned for another visit in December 2019 for Christmas. He stayed with Jennifer for a week to 10 days during the Christmas holiday.

¶ 14    Hanke testified that, beginning in 2019, on certain occasions, Jennifer would attend out-of-state dance competitions with one of her children while he would stay at her house and watch the other children. He had no knowledge as to why he stayed with the children instead of Joseph. He acknowledged that he would care for and feed the children when Jennifer was away from home. Jennifer and Hanke continued to visit each other in 2020.

¶ 15    Hanke moved to Illinois from Colorado in February 2021. He testified that he moved to Illinois to prove his commitment to Jennifer. At the time of his move, Jennifer had undergone surgery and he stayed at her home for three weeks to help her recuperate. Afterwards, he moved in with Jennifer's mother, where he resided for about eight or nine months. He had signed a lease agreement with Jennifer's mother, a copy of which was admitted into evidence without objection. Then, he rented a room at a communal house in Aurora but could not recall the names of roommates with whom he shared the room. Hanke stated he did not know who else lived there "[b]ecause we all keep different hours." He renewed the six-month lease four times and a copy of the lease from the communal house was admitted into evidence without objection. He described the residence as "a room upstairs" with "multiple other rooms where other folks rent." He had access to a shared laundry room, television, and bathroom.

¶ 16    In June 2021, Hanke traveled to Disney World with Jennifer, his son, her children, and Jennifer's mother. Also during that summer, Hanke, Jennifer, her children, and Jennifer's family members traveled to Branson, Missouri, and Pensacola, Florida. Jennifer paid for the airfare.

¶ 17    In November 2021, Jennifer's mother passed away and Hanke attended the funeral with her. He stood in the family receiving line with Jennifer. Hanke's name was listed in the funeral program in brackets after Jennifer's name.

¶ 18    Hanke traveled with Jennifer to Jamaica and Niagara Falls in 2022. She paid for the airfare and hotel. Hanke attended Jennifer's graduation party in May 2022 and was also present for Mother's Day. He testified that he celebrated holidays with Jennifer, including Easter, Labor Day, Halloween, Thanksgiving, and Christmas. He also attended a number of celebrations with the children, including a graduation party.

¶ 19    In January 2023, Hanke, Jennifer, and her children flew to Colorado for a celebration of Hanke's father's life. Hanke, Jennifer, and her children went on a cruise during the summer of 2023, for which Jennifer had paid.

¶ 20    Hanke testified that he spoke about his experiences as an Air Force veteran at the children's school. He stated that he does his laundry at Jennifer's house, but not on a regular basis. He keeps his cats at Jennifer's house but pays the expenses to care for the cats. Hanke stated that he keeps his video game console at Jennifer's house because the children enjoy using it. He stays at Jennifer's house 30 to 40 percent of the time, including overnights, but most of the time, the children are not at the house when he stays there.

¶ 21    Hanke testified that he plays board games with the children, helps them with their homework, administers medicine to them with Jennifer's authorization, and takes them to their activities when Jennifer is not present. He also volunteered for events at the children's school and helped them with school projects. Counsel for Joseph presented Hanke with a number of photographs depicting him with Jennifer's children, some of which were admitted into evidence without objection and some admitted over objection. Some of the photographs depicted Hanke attending school events with the children, including prom. Hanke testified that he took the children to various appointments. In addition, he stated that he had instructed Jennifer to insult Joseph in front of the children "so much that his own kids hate him."

¶ 22    Hanke testified that he tells Jennifer that he loves her and he refers to her father as "dad." He also described a necklace that he gave to Jennifer for Christmas that had a charm on it stating, "Forever and Always."

¶ 23    Hanke stated that he paid his own rent and did not contribute to paying Jennifer's mortgage. He testified at length regarding his separate finances from Jennifer's. He stated that he does not plan to either propose to Jennifer or to reside with her. To his knowledge, he is not legally divorced from his current wife. He considers himself to be a Colorado resident. He clarified that while Jennifer had paid for flights, he had reimbursed her for other travel expenses. He stated that when he is invited to go on a trip with her, he pays for certain things, including food, but pays her in cash for his portion of the vacation "just to help pay because I don't want her paying for me." He stated that he always reimburses her for trips. He testified that he was unaware of the amounts of Jennifer's expenses for her mortgage, her vehicle, or the children.

¶ 24    Jennifer testified that she resides in a home with her five children and is employed as a hospice social worker, earning $70,000 per year. She completed a master's degree in social work in May 2022, following her divorce from Joseph. She pays for the mortgage, property taxes, groceries, pet care, and other bills every month. When Hanke joins her and the children on a vacation, he reimburses her for his portion of the trip.

¶ 25    Jennifer stated that Hanke is a good role model for her children and that if he were no longer in her children's lives, they would miss him. She has been in an exclusive relationship with Hanke since 2018. Hanke did not physically move into Jennifer's home and she does not plan to combine her household with Hanke.

¶ 26    Jennifer next testified regarding Hanke's relationship with her children. She permitted Hanke to participate extensively in the children's school events and activities. He served as an

emergency contact at the children's school, but Jennifer explained that she used his name because her mother was too ill at that point to serve as an emergency contact. Jennifer stated that Hanke was listed on a website that allowed him to review her children's artwork online. Hanke bought presents for the children and attended their birthday celebrations. Hanke attended all the holidays celebrated at Jennifer's home since he moved to Illinois in 2021. He also attended out-of-state competition events involving the children and cared for the children who were not competing.

¶ 27 Hanke resided as a tenant at Jennifer's mother's house until she passed away in November 2021. Jennifer stated that Hanke stood in the receiving line with her at her mother's funeral. She agreed that her mother's obituary listed Hanke's name next to hers in brackets and that she had personally approved Hanke's name to be included next to hers in the obituary. An exhibit depicting a copy of the obituary was admitted into evidence over objection. Hanke was also listed as a "family mourner" on the funeral service's brochure, although Jennifer stated that she "didn't know his name was going to be on there." Jennifer testified that she had attended the life celebration for Hanke's father in Colorado in January 2023.

¶ 28 Jennifer testified that she had loaned money to Hanke to help him pay his bills. When Jennifer and Hanke travel together on vacation, he reimburses her in cash for his travel expenses. She stated that, sometimes when she was not present, Hanke used her credit card to purchase items for her children. She does not share bank accounts, investment accounts, or credit card accounts with Hanke.

¶ 29 Jennifer asked Hanke to move to Illinois to be with her. Hanke sold his house in Colorado to move to Illinois. Jennifer asked her neighbor if Hanke could park his truck in her driveway and on numerous occasions, he parked his truck there. Hanke has access to Jennifer's home by using the code to the garage door. Hanke does not pay Jennifer to board his cats at her home. Hanke does

his laundry occasionally at her home. When Hanke stays at her house overnight, he brings his own clothes and a toiletry kit and takes it with him when he leaves. He would stay at Jennifer's home when the children were not there.

¶ 30 Next, Jennifer testified about the inclusion of Hanke on her social media pages, which included various profile pictures of her and Hanke together, along with pictures of him and the children together at various events, birthdays, holidays, and vacations. A large number of exhibits depicting these pictures and social media posts were admitted into evidence without objection and over objection, and the trial court sustained some of the objections to preclude commentary or narratives appearing underneath the photographs or in posts.

¶ 31 Finally, Jennifer testified regarding a text message exchanged between herself and Joseph from November 20, 2018, in which she stated, "even when [Hanke] moves out here he and I won't be [']Living Together['] for 11 years, sorry Charlie." Jennifer stated that she sent Joseph that text in response to him saying "he wished that [Hanke] and I would move in together with a dollar sign behind it." Counsel for Joseph moved to admit the exhibit containing the text message into evidence, which was admitted without objection.

¶ 32 Jacob Osojnak, a private detective, testified that Joseph retained him to conduct a cohabitation investigation, which involved physical surveillance to determine whether a person is staying at another party's residence. He completed four investigative reports beginning in October 2021 through February 2022 and testified regarding the number of times he observed Hanke's truck parked in Jennifer's driveway during his surveillance. Osojnak testified that his investigation required surveilling whether the subject vehicle was located at Jennifer's residence. He was not specifically surveilling Hanke and could not provide a description of him. Osojnak also was unaware if Jennifer was at home during any of the drive-by surveillance he conducted for the

investigation. Osojnak had no independent information regarding who was at the home during any of the periods of his surveillance. He had no evidence as to whether Hanke resided at Jennifer's residence other than observing Hanke's vehicle parked there.

¶ 33    Joseph testified that Hanke was "always there," referring to the children's events or activities. Joseph described other events involving his children where Hanke attended but Jennifer did not. He stated that he observed Hanke's truck "regularly parked in [Jennifer's] driveway."

¶ 34    Joseph testified that he was no longer employed, but that his current source of income was derived from investments. His financial affidavit, which was admitted into evidence without objection, reflected that, despite his unemployment, he received a dividend income of $3,500 per month and investment income of $8,000 per month. He formerly served as the CEO of Oberweis Dairy but resigned from his position on June 7, 2023. He owned a 30% to 35% share of the company in 2019. At the end of 2022, he sold his shares of stock in Oberweis Dairy to his siblings for a little less than $2 million, which provides the source of his dividend and interest income. He still owns approximately a 20% share of stock in the family's parent company. Joseph began to look for employment immediately after resigning from the family business. He stated that he has not rejected any positions since leaving Oberweis Dairy and has not received any offers for employment. He described in detail his attempts to secure employment.

¶ 35    According to Joseph's financial affidavit, he estimated his total monthly living expenses to be $26,180 per month, not including the maintenance he pays monthly to Jennifer. When he resigned from his CEO position at Oberweis Dairy in July 2023, he was aware that he could be unemployed for about two years. He testified that, despite his unemployment, he had scheduled a vacation to Mexico, booking airfare totaling $8,000 and renting a house for $14,000, including an on-site chef. He stated that he did not reduce his spending on vacations "to take advantage of the

opportunity with my kids. But on other expenses I think we are." He also planned upcoming trips to Washington, D.C. and Hawaii. He continued to pay his credit card bills in their entirety every month, including more than $30,000 in August 2023. In addition, he pays his legal representation $20,000 per month. He provides a monthly stipend of $3,500 to his current wife for personal use.

¶ 36    Joseph testified that, since his unemployment, he has not missed any mortgage payments, maintenance payments, or credit card payments. He stated that if a financial opportunity arose to purchase some assets of Oberweis Dairy in a distress sale, he would work with an investor group to buy the assets. For example, he had considered investing between $500,000 and $1 million of his own money to purchase some of the Oberweis Ice Cream and Dairy stores with his father. Joseph stated that, ultimately, he could rely on his assets to support himself and his family until he could find employment.

¶ 37    On July 24, 2024, the trial court granted a declaratory judgment in favor of Joseph and against Jennifer. The court entered a detailed, written order finding that Jennifer and Hanke were cohabiting under section 510(c) of the Act and had been involved in a *de facto* marriage since November 2021, when Jennifer had approved the inclusion of Hanke's name in her mother's obituary. 750 ILCS 5/510(c) (West 2018). The court considered at length whether Jennifer and Hanke were involved in a *de facto* marriage rather than an intimate dating relationship based on the totality of the circumstances of their relationship.

¶ 38    The trial court found "a 6-year monogamous relationship to be more akin to a *de facto* marriage than an intimate dating relationship," but placed little weight on this factor alone. Instead, the gravamen of the court's conclusion focused upon Hanke's relationship with Jennifer's children, finding that, although he could "easily be financially segregated [from Jennifer], it is abundantly clear that [the] children cannot be emotionally segregated without drastic consequences to

everyone involved." The court stated that Jennifer significantly downplayed Hanke's importance to her children when she testified that " 'they might miss him but they would move on' " when asked if it would be harmful to the children if Hanke was not in their lives. The court then listed 21 different examples of Hanke's involvement with the children, along with a discussion of text messages replete with communications rendering the "obvious" conclusion that she had vested Hanke with a caretaking role for her children. The court stated that "Jennifer, by way of allowing [Hanke] to participate so frequently and intimately in the lives of her children, has demonstrated that she is fully committed to her relationship with [Hanke] and intends it to be permanent, regardless of whether she actually intends on being married to him." Hanke's caretaking role of Jennifer's children weighed strongly in favor of the court's finding of a *de facto* marriage.

¶ 39    In addition, the trial court found that Jennifer's listing of Hanke's name in her mother's obituary weighed strongly in favor of a *de facto* marriage and further supported Jennifer's belief in the permanence of the relationship. The court also considered communications between Jennifer and Hanke that demonstrated the permanence of, and mutual commitment to, their relationship. The court noted how the parties frequently texted and expressed their love back and forth, including a message that Hanke sent to Jennifer stating, "I just wanted to tell you that I am so thankful you are in my life." Jennifer responded, "If you were not in my life then [*sic*] I wouldn't want to exist anymore."

¶ 40    The trial court found that November 2021 was the appropriate date reflecting the beginning of Jennifer and Hanke's *de facto* marriage because it was "the first time that Jennifer publicly published her relationship with [Hanke] to the outside world in such a manner for the Court to be able to find her in a *de facto* marriage." Based on the finding of cohabitation, the court implemented the maintenance modification formula provided in paragraph 2.11 of the MSA.

¶ 41 The trial court considered evidence of Hanke's and Joseph's income when calculating the modified amount of maintenance. After recounting in great detail Joseph's financial history, the court concluded that he had "not modified his lifestyle since the reduction or the elimination of his salary from the corporation" and had "not reduced any of his monthly expenditures since resigning from his position." The court noted that Joseph remained able to pay all his credit cards on a monthly basis, "even with the significant amounts of attorneys' fees that have been incurred in the present litigation." In addition, Joseph "continued to take lavish vacations and his new wife, who plans the family vacations, has not been given any constraints or restrictions on her planning activities." The court also noted that Joseph "still provides his new wife with $3,500 per month to cover her personal expenses and there was no evidence that he asked her to reduce those." The court concluded that Joseph had "substantial assets and is well-able to continue paying his maintenance obligation to Jennifer and to contribute to the child-related expenses as previously ordered, in spite of the loss of income." As a result, the court denied Joseph's motion to modify maintenance and for other relief.

¶ 42 The trial court reduced Joseph's maintenance obligation to $98,700 per year, or $8,225 per month, effective November 1, 2021. The court found that, because Joseph had paid $13,000 per month in maintenance until the date of its finding, Joseph's reduced obligation had resulted in an overpayment of $157,575. To offset the overpayment, the court ordered a reduction of Joseph's monthly maintenance payments to Jennifer by $2,764.47 per month for the next 57 months. In sum, the court ordered Joseph to pay Jennifer $5,460.53 per month for the remainder of the maintenance period.

¶ 43 On August 23, 2024, Jennifer moved to reconsider the trial court's decision, arguing that the court improperly interpreted the MSA when it modified maintenance by using a totality of the

circumstances analysis without making an actual finding that she was cohabiting with Hanke as provided in paragraph 2.11 of the MSA. After hearing the parties' arguments, the court denied Jennifer's motion. Initially, the court acknowledged that paragraph 2.11 of the MSA contains "various clauses, definitions, [and] modifications." The court stated that paragraph 2.11 of the MSA was not a simple provision to interpret and required consideration of certain factors to determine whether a *de facto* marriage existed. The court also specifically found that paragraph 2.11 was not vague. The court concluded that "if the factors for a *de facto* marriage don't exist in this case, I'm not sure when they ever would, quite frankly."

¶ 44    On November 19, 2024, the trial court entered an agreed order containing a special finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). Jennifer timely appealed the court's declaratory judgment finding of cohabitation. Joseph filed a timely cross-appeal challenging the denial of his motion to modify maintenance and seeking reversal of the court's entry of a protective order allowing Jennifer to redact text messages.

¶ 45                                        II. ANALYSIS

¶ 46    On appeal, Jennifer argues that the trial court erred when it found cohabitation based on a totality of the circumstances without also finding that she was cohabiting with Hanke specifically based on having "actual, physical, residential cohabitation consisting of a combination of households," as provided in paragraph 2.11 of the MSA. Jennifer contends that the parties contracted such that cohabitation must have a physical residential component and, because she and Hanke did not reside together, the cohabitation finding under paragraph 2.11 of the MSA was incorrect. She maintains that the parties explicitly defined cohabitation to consist of a combination of households, meaning, joining her home and household with Hanke. Jennifer argues that without

- 14 -

a finding consistent with the definition of cohabitation in the parties' MSA, a modification cannot be triggered.

¶ 47   Joseph responds that the evidence presented at trial supported the ultimate finding that a *de facto* marriage existed between Jennifer and Hanke. He argues that, if paragraph 2.11 of the MSA precluded him from seeking relief unless he could prove a single residence consisting of Jennifer and Hanke, it would have completely undermined his ability to do so considering Jennifer's efforts to obscure the seriousness of their relationship. He contends that the trial court made its ruling under the proper standard, including paragraph 2.11 of the MSA and other factors it considered when determining whether a *de facto* marriage existed. In his cross-appeal, he maintains that the court improperly entered protective orders limiting his ability to review certain text messages between Jennifer and Hanke. In addition, he argues that the court erred when it failed to find that there had been a substantial change in Joseph's financial circumstances warranting a modification of his obligations under the MSA.

¶ 48   Before addressing the merits of this appeal, Joseph submitted in his response brief that Jennifer's statement of facts was incomplete and self-serving in that it excluded facts important to the understanding of the trial court's ultimate conclusion as well as the case generally, in violation of Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). Rule 341(h)(6) requires a statement of facts "necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate references to the pages of the record on appeal." *Id*. We agree that Jennifer's opening brief violates Rule 341(h)(6) because it was woefully inadequate in providing this court with facts necessary to an understanding of the case when considering the sheer volume of evidence presented during a three-week intermittent trial and a necessary *de novo* review of that evidence on appeal. We can only surmise that Jennifer provided such a short statement of facts

because presenting less evidence perhaps would support her argument that she did not have a *de facto* marital relationship with Hanke.

¶ 49     Compounding Jennifer's paltry statement of facts, she also failed to comply with Illinois Supreme Court Rules 342(a)(1) and (3) (eff. Oct. 1, 2019), which require an appellant's brief to include "an appendix [and] a complete table of contents, with page references, of the record on appeal." Jennifer's table of contents to the record on appeal in her appendix is merely a copy of the table of contents from the trial court's records, which in no way provides this court with a means to navigate the more than 3,000-page record in a complex postdecree proceeding. Jennifer was required to include a table of contents to the record that stated the nature of each document, order, or exhibit, and the dates of filing or entry of orders. Here, Jennifer's table of contents to the record on appeal following an intermittent three-week trial, consisting of more than 1,000 pages of the common law record, 1,363 pages of trial testimony, more than 500 pages of an impounded record, and more than 500 pages of exhibits, provided no detail whatsoever as to the nature of testimony, each document, order, or exhibit.

¶ 50     Supreme court rules are not merely suggestions but are necessary for the proper and efficient administration of the courts. *In re Marriage of Kiferbaum*, 2014 IL App (1st) 130736, ¶ 20. When a brief fails to follow the requirements set forth in the supreme court rules, we may dismiss the appeal. *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 21; *Fender v. Town of Cicero*, 347 Ill. App. 3d 46, 51 (2004). Indeed, our supreme court's rules are not simply hortatory but are mandatory and are to be scrupulously followed. *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38. We recognize, however, that striking a brief or dismissing an appeal is a particularly harsh sanction. *People v. Thomas*, 364 Ill. App. 3d 91, 97 (2006) (citing *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005)). Although Jennifer's deficient brief

frustrates our review, we will consider the merits of the appeal. We admonish Jennifer's counsel to adhere to the requirements of the supreme court rules in future appeals.

¶ 51                                A. Standard of Review

¶ 52    Under the Act, when a marriage is dissolved, a trial court "may grant a maintenance award for either spouse" or the spouses can agree on maintenance payments pursuant to an MSA. 750 ILCS 5/502(a), 504(a) (West 2018). The terms of an MSA are binding on the parties and the courts. *Blum v. Koster*, 235 Ill. 2d 21, 32 (2009); see 750 ILCS 5/502(b) (West 2018). In an MSA, "[t]he parties may provide that maintenance is non-modifiable in amount, duration, or both." 750 ILCS 5/502(f) (West 2018). If the parties do not so specify, a spouse's maintenance obligations are modifiable "upon a substantial change of circumstances." *Id*. Here, the parties agreed to and executed an MSA with specific provisions for the allocation of maintenance.

¶ 53    An MSA is a contract, subject to the usual rules of contract interpretation. *Blum*, 235 Ill. 2d at 33. When interpreting a contract, the reviewing court's objective is to give effect to the parties' intent, determined from the language of the contract given its ordinary meaning. *In re Marriage of Scarp*, 2022 IL App (1st) 210711, ¶ 11. "As a general rule, the parties' intentions are determined from their final agreement." *Kehoe v. Commonwealth Edison Co.*, 296 Ill. App. 3d 584, 590 (1998). Illinois follows the "four corners rule for contract interpretation in that, '[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used.' " *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of

law without the use of parol evidence." *Id*. We review contract interpretation *de novo*. *Blum*, 235 Ill. 2d at 33.

¶ 54                                     B. Interpretation of the MSA

¶ 55     Jennifer argues that the parties' MSA defines cohabitation to include essential terms for a modification to occur and that the MSA was clear and unambiguous as to the definition of cohabitation. She contends that the parties specifically contracted around the statutory requirement that maintenance be terminated upon cohabitation, as provided in section 510(c) of the Act. 750 ILCS 5/510(c) (West 2018). Jennifer asserts that the trial court erred when it utilized a totality of the circumstances analysis and bypassed the operational terms of the MSA that defined cohabitation, thereby making those terms superfluous. She insists that the definition of cohabitation in the MSA is not subsumed by the other factors in law but should be considered on its own terms. She argues that, in effect, she and Joseph specifically contracted for and enumerated in their MSA what specific factors would hold the most import to a determination of cohabitation. Jennifer contends the court failed to consider the contractual terms the parties had agreed to when it found that she was cohabiting with Hanke.

¶ 56     Jennifer maintains that "cohabitation" under the terms of the MSA here requires a physical, residential component, meaning that the alleged paramour must be residing in the party's home. According to Jennifer, "under a traditional totality of the circumstances analysis, whether the couple resides together is just one circumstance of determining cohabitation," whereas in this case, "the parties' agreement requires co-residency for [her] to be cohabiting." In short, Jennifer argues that the plain language of the MSA requires actual, physical residency. She contends that the court made no finding that she and Hanke resided together or shared a home together.

¶ 57    Further, Jennifer argues that the parties explicitly defined cohabitation to consist of a combination of households, meaning that she would have had to join her home and household with Hanke. Jennifer contends that the trial court made no such finding that she and Hanke had combined their homes or households. She points out that the court found no financial intermingling between her and Hanke. Thus, she maintains that without a finding of "actual, physical, residential cohabitation consisting of a combination of households, cohabitation cannot be determined, and a maintenance modification cannot be triggered in accordance with the [MSA]." We disagree.

¶ 58    Section 510(c) of the Act provides, "[u]nless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated by the death of either party, or the remarriage of the party receiving the maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2018). The rationale for this rule is that it would be inequitable for a person to receive maintenance while he or she is involved in a husband-and-wife relationship with a new paramour but does not legally formalize it. *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994).

¶ 59    Here, when the parties executed the MSA, which was incorporated into the judgment for dissolution of marriage, they agreed in paragraph 2.11 that Jennifer's "cohabitation on a continuing conjugal basis (not a dating relationship but actual physical, residential cohabitation consisting of a combination of households, along with any other factors then existing in law) shall not serve as a terminating event." Paragraph 2.11 then sets forth a schedule to determine the amount of maintenance "[i]n the event she cohabits *** prior to May 6, 2029." In short, the parties agreed to not terminate maintenance payments under section 510(c) of the Act in the event Jennifer was found to be cohabitating but instead modify it based upon an agreed formula. Part of paragraph

2.11 mirrors section 510(c), when it states, "cohabitation on a continuing conjugal basis." The language included thereafter in the parentheses appears to be an attempt by the parties to narrow the definition of cohabitation.

¶ 60    Our supreme court has held that a contract will not be interpreted in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011) (a contract must be read as a whole and its provisions interpreted in conjunction with each other). Indeed, "when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Id*.

¶ 61    In this case, Jennifer seeks application of only the first clause contained in the parentheses of paragraph 2.11 of the MSA, "actual physical, residential cohabitation consisting of a combination of households," without consideration of the language in the second clause of the sentence, "along with any other factors then existing in law." Jennifer argues that considering "any other factors then existing in law" would be redundant considering that the MSA requires a heightened standard of actual, physical, residential cohabitation to be proven. However, "[t]he rules of contract interpretation require us to give effect to all of a contract's terms and to avoid rendering other terms meaningless." *In re Marriage of Hoffman*, 264 Ill. App. 3d 471, 475 (1994).

¶ 62    Moreover, as the parties specifically contracted to prevent termination of maintenance under section 510(c) of the Act, they likewise could have defined cohabitation in paragraph 2.11 as "living together in a single residence" but chose not to do so. In addition, the parties could have further elaborated what it means to have "a combination of households." "A court may not add to a contract terms that the parties have not expressly included." *In re Marriage of Tutor*, 2011 IL App (2d) 100187, ¶ 13.

¶ 63    Here, the parties agreed that cohabitation under the MSA is "actual physical, residential cohabitation consisting of a combination of households, *along with any other factors then existing in law*." Ignoring the second clause, "along with any other factors then existing in law," would render those terms meaningless when the parties themselves specifically included that language in the contract. *Hoffman*, 264 Ill. App. 3d at 475. "It is not what one of the parties may have intended that controls, but what is shown by the contract to have been the intention of *both* parties." (Emphasis added.) *Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 524 (1997). Further, "[t]he language of a contract is not ambiguous simply because the parties disagree upon its meaning, nor is it ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." (Internal citations omitted.) *Id*. In sum, paragraph 2.11 of the MSA provides that "any other factors then existing in law" are to be considered in conjunction with whether there was an "actual physical, residential cohabitation consisting of a combination of households." *Thompson*, 241 Ill. 2d at 442.

¶ 64    In this case, where the parties agreed to an MSA with terms governing cohabitation in paragraph 2.11, the trial court had no choice but to give effect to those terms, which included the application of "any other factors then existing in law." *In re Marriage of Shulga*, 2019 IL App (1st) 182028, ¶ 23. It appears that Jennifer believed that if she kept her finances separate from Hanke and maintained a separate residence, that evidence would be enough to meet her definition of paragraph 2.11 of the MSA. The language of paragraph 2.11, however, did not require a specific finding that Jennifer and Hanke live together in one residence. Further, a "combined household" as Jennifer would define it would be limited to commingled finances or where the significant other keeps his personal belongings, which are factors that the trial court certainly considered in this

case. As will be discussed in greater detail herein, the court also considered "any other factors then existing in law," which language the parties agreed to in their MSA. We find no error in the trial court's method of interpreting the unambiguous language of paragraph 2.11 and applying "any other factors then existing in law" pursuant to the MSA when it made its findings. *Thompson,* 241 Ill. 2d at 442; *Shulga*, 2019 IL App (1st) 182028, ¶ 23; see *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008) ("Where the language of the agreement is clear and its meaning is unambiguous, courts must give effect to that language."). We reject Jennifer's argument that the court improperly relied upon a totality of circumstances analysis of the factors then existing at law in arriving at its decision.

¶ 65        C. The Manifest Weight of the Evidence Supports the Trial Court's Findings

¶ 66    Next, we consider whether the trial court's finding that Jennifer and Hanke had a *de facto* marriage by cohabitation was against the manifest weight of the evidence. Jennifer argues that the evidence does not support a determination that she and Hanke had actual, physical residential cohabitation consisting of a combination of households in accordance with the MSA.

¶ 67    As incorporated in the parties' MSA, maintenance will be modified upon a finding of Jennifer's "cohabitation on a continuing conjugal basis (not a dating relationship but actual physical, residential cohabitation consisting of a combination of households, along with any other factors then existing at law)." "Whether the relationship rises to the level of a *de facto* marriage is generally a question of fact." *In re Marriage of Larsen*, 2023 IL App (1st) 230212, ¶ 110. The party seeking the cohabitation finding must show by a preponderance of the evidence that "a *de facto* husband-and-wife relationship exists." *Herrin*, 262 Ill. App. 3d at 576; see *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929 (2006).

¶ 68    In determining whether the party has met his or her burden, "a court looks to the totality of the circumstances and considers the following nonexhaustive list of factors: (1) the length of the relationship; (2) the amount of time spent together; (3) the nature of the activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40 (citing *Susan*, 367 Ill. App. 3d at 929). If the initial burden is met, the burden then shifts to the recipient spouse to show that he or she is not engaged in a *de facto* husband-and-wife relationship. *Larsen*, 2023 IL App (1st) 230212, ¶ 109. Each cohabitation case "turns on its own set of facts; just as no two relationships are alike, no two cases are alike." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. The reviewing court will not disturb the trial court's ruling on the issue of cohabitation unless it is against the manifest weight of the evidence. *Id*. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the decision is unreasonable, arbitrary, or not based on the evidence." *Id*. (citing *In re Marriage of Nord*, 402 Ill. App. 3d 288, 294 (2010)).

¶ 69    In *Miller*, this court cautioned that while a consideration of the non-exhaustive list of six factors is helpful to any determination of maintenance modification or termination, it should not be considered a checklist whereby a court merely notes the presence of certain facts that fit into each factor. *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶¶ 46, 48, 60. Instead, "courts should be mindful that the circumstances of an intimate dating relationship are also likely to involve facts that fit into each of the six factors, such that those facts in their totality must attain a certain gravitas to establish a *de facto* marriage." *Id*. ¶ 46. The *Miller* court disagreed that the six factors alone were sufficient "to encapsulate the totality of the circumstances in all cases," because they "focus greatly on the emotional and social components of a relationship as opposed to

- 23 -

practical and financial aspects that life partners share." *Id*. ¶ 48. Nevertheless, a court's application of the six-factor analysis should still consider the true purpose of section 510(c) of the Act when considering whether maintenance should be terminated or, under the MSA in this case, modified " 'whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means.' " *Id*. ¶ 50 (quoting *In re Marriage of Sappington*, 106 Ill. 2d 456, 467 (1985)). The *Miller* court explained, "[t]hat is why, in using the six-factor analysis, a court must weigh the seriousness or magnitude of a given factor and not just note its presence." *Id*. Further, "[c]ourts should look for signs of mutual commitment and permanence." *Id*.

¶ 70    The *Miller* court distinguished between an intimate dating relationship and a more marriage-like relationship, stating:

> "Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." *Id*. ¶ 61.

¶ 71    With these principles in mind, we hold that the trial court's finding that Jennifer and Hanke were involved in a *de facto* marriage was not against the manifest weight of the evidence because not only do the six factors support a finding of a *de facto* marriage, other facts establish a deep level of family blending and time spent together, along with intended permanence and mutual commitment.

¶ 72    The first factor concerns the length of the parties' relationship. Jennifer and Hanke began an exclusive relationship together in 2018. The couple shared a monogamous and sexual relationship. Indeed, Hanke moved from Colorado to Illinois in February 2021 to demonstrate his commitment to Jennifer. These facts suggest a *de facto* husband-and-wife relationship more than an intimate dating relationship (*In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 27), however, the trial court placed "very little weight on this factor alone" in its ruling.

¶ 73    We next consider the second factor (amount of time spent together), wherein the trial court noted that it had difficulty quantifying the actual amount of time that Jennifer and Hanke spent together. Hanke testified that when he initially moved from Colorado to Illinois, he stayed at Jennifer's house for a few weeks to help her recuperate from surgery. Thereafter, he moved in with Jennifer's mother for about eight or nine months and then rented a room at a communal house. Hanke testified that he did not know the names of other roommates at the communal house despite renewing his six-month lease four times. Hanke testified that he spent 30% to 40% of his overall nights at Jennifer's residence and 50% of the nights there when the children were not present. Osojnak, whom Joseph had hired to conduct surveillance of Jennifer's residence, testified that he had observed Hanke's vehicle parked in Jennifer's driveway during overnight hours on 15 of the 28 nights that he conducted surveillance. Although the observation of Hanke's vehicle in Jennifer's driveway did not necessarily indicate Hanke's presence inside Jennifer's home, the court reasonably inferred his presence there. Based on the evidence, the court found that Hanke and Jennifer had spent 50% of their overnights together. Nevertheless, the court did not find this factor weighed strongly in favor of either an intimate dating relationship or a *de facto* marriage. We agree that the evidence was not conclusive regarding the amount of time Jennifer and Hanke shared together.

¶ 74    The third factor (nature of activities engaged in), however, strongly weighs in favor of a *de facto* marriage. The evidence presented at trial conclusively established that Hanke and Jennifer's children developed a significant bond with each other. Jennifer entrusted Hanke with her children to the extent that he traveled with Jennifer and the children on multiple vacations together, celebrated the birthdays of her children, volunteered regularly at the children's school, attended the children's activities and important life events, and celebrated many holidays with the children. Jennifer further entrusted Hanke to care for her children when she was not present. Indeed, beginning in 2019, on certain occasions, Jennifer would attend out-of-state dance competitions with one of her children while Hanke stayed with the other children at her house. He cared for the children and fed them when Jennifer was away from home. Jennifer testified that Hanke also attended the children's out-of-state competitions and cared for the children who were not competing. Hanke testified about how he played board games with the children, helped them with their homework, bought them presents, and administered medication to them. Hanke was listed on a website that allowed him to review the children's artwork online. Numerous pictures, admitted as exhibits, demonstrated Hanke's closeness to Jennifer's children and consistent involvement in their activities and life events. Following the death of her mother in November 2021, Jennifer approved the wording of her mother's obituary, which listed Hanke's name in brackets next to hers, an indication of Hanke's elevated status in her life. In January 2023, Jennifer flew with her children to Colorado for a celebration of Hanke's father's life. The evidence presented at trial overwhelmingly demonstrated that Jennifer, by way of allowing Hanke to participate so frequently, extensively, and intimately in the lives of her children, exemplified her commitment to Hanke. We agree with the trial court that this factor weighs strongly in favor of the existence of a *de facto* marriage.

¶ 75    The fourth factor involves the interrelation of Jennifer's and Hanke's personal affairs. The evidence did not show an intermingling of finances, however, this is reasonably explained by the incentive to maintain the current level of maintenance, which is supported by Jennifer's November 20, 2018, text message to Joseph. See *Miller*, 2015 IL App (2d) 140530, ¶ 61. Jennifer and Hanke kept separate bank accounts and their testimony showed that they did not pay each other's bills. Hanke testified that he would reimburse Jennifer in cash for his share of the vacations they took together.

¶ 76    Although Jennifer and Hanke kept their financial affairs separate, as we have already discussed, they significantly intermingled many other personal affairs, particularly involving Jennifer's children. Jennifer attempted to downplay Hanke's relationship with her children, but the evidence demonstrated otherwise. The trial court listed 21 different examples of Hanke's involvement with the children in its declaratory judgment order, including his expression of love for one of them, regularly transporting them to extracurricular activities upon Jennifer's request, and volunteering for school field trips with Jennifer's authorization. Jennifer had listed Hanke as an emergency contact at the children's schools. Further, Jennifer's texts to Hanke were replete with communications regarding the children to the extent it was obvious that she had vested him with a caretaking role for her children. Jennifer permitted and encouraged the safekeeping and care of her children to Hanke, which ultimately demonstrates that she is fully committed to her relationship with him and intends it to be permanent, regardless of whether she actually intends to be married to him. The evidence of the interrelation of their personal affairs strongly supports a finding of the existence of a *de facto* marriage.

¶ 77    Considering the fifth factor, whether Jennifer and Hanke vacationed together, the record shows that Jennifer and Hanke frequently traveled together, mostly with her children and

sometimes with Jennifer's other family members or with Hanke's son. Beginning in 2019, Hanke traveled with Jennifer, her children, and her mother to Sanibel Island, Florida for a two-week vacation. In June 2021, he traveled with his son, Jennifer, and her children to Disney World. During the same summer, Hanke, Jennifer, her children, and Jennifer's family members traveled to Branson, Missouri and Pensacola, Florida. Hanke traveled with Jennifer to Jamaica and Niagara Falls in 2022. Hanke, Jennifer, and her children flew to Colorado in January 2023 for a celebration of Hanke's father's life. During the summer of 2023, Hanke, Jennifer, and her children went on a cruise together. The frequent vacations taken by Jennifer and Hanke, combined with the involvement of her children and their family members on several of the trips, supports a finding that they were in a *de facto* husband-and-wife relationship. See *In re Marriage of Miller*, 2024 IL App (3d) 230098, ¶¶ 71-74 (concluding that this factor favored a finding of a *de facto* marriage, where the couple took seven or eight trips; the fact that the trips often involved family members "showed a level of commitment that was more akin to a *de facto* marriage"); *In re Marriage of Churchill*, 2022 IL App (3d) 210026, ¶ 40 (finding that taking at least 10 trips together, including trips involving family gatherings, during a three-and-a-half-year period evidenced a *de facto* husband-and-wife relationship). In *Churchill*, although the couple paid their own expenses on those trips, the reviewing court found "that does not discredit the fact that they frequently vacationed together as a couple." *Churchill*, 2022 IL App (3d) 210026, ¶ 40. Similarly, in this case, the fact that Hanke reimbursed Jennifer for his expenses for the vacations does not minimize the amount of time they traveled together as a family. *Id.*

¶ 78 The sixth factor considers whether Jennifer and Hanke celebrated holidays together. The evidence shows that not only did they spend holidays together but that Hanke frequently celebrated holidays with Jennifer's children as well. Hanke testified that he celebrated Easter, Labor Day,

Halloween, and Christmas with Jennifer and the children. Jennifer testified that Hanke attended all the holidays celebrated at Jennifer's home since he moved to Illinois in 2021. He took the children trick-or-treating on Halloween and bought the children birthday presents. Hanke attended a graduation party for one of Jennifer's children. Given the multitude of holidays and special occasions Hanke spent with Jennifer, her children, and her family members, we conclude this factor also supports the finding of a *de facto* husband-and-wife relationship.

¶ 79    Further, the trial court in this case weighed "the seriousness or magnitude of each given factor" considering the totality of the circumstances, before concluding that Jennifer and Hanke were in a *de facto* marriage. See *Miller*, 2015 IL App (2d) 140530, ¶¶ 67-68. Prior to Hanke moving to Illinois, Jennifer frequently urged Hanke to come "home." She asked Hanke to move to Illinois to be with her. Hanke testified that he ultimately moved to Illinois to prove his commitment to Jennifer. They regularly texted messages of love back and forth. Hanke referred to Jennifer's father as "dad." Hanke testified that he had purchased a charm for Jennifer that was engraved with "Forever and Always." In March of 2023, after Hanke had sent a text message to Jennifer stating, "I just wanted to tell you that I am so thankful you are in my life," she responded, "I love you too sweetheart! If you were not in my life then [*sic*] I wouldn't want to exist anymore." These expressions are evidence of intended permanence of their relationship despite Jennifer's protestations. See *id*.

¶ 80    In the context of analyzing non-exhaustive factors, a court may consider a party's awareness of the legal consequences of cohabitation, especially where the parties alter their behavior to hide the true nature of their relationship. *Id*. ¶¶ 65-66; *Herrin*, 262 Ill. App. 3d at 577-78. The record in this case shows that Jennifer and Hanke were aware of the legal consequences of cohabitation and that they altered their behavior to hide the nature of their relationship. For

- 29 -

example, Jennifer arranged with her neighbor, Sandy Cobb, to have Hanke park his vehicle in Sandy's driveway on multiple occasions. We can reasonably infer Jennifer made this arrangement to avoid Hanke's vehicle being observed in her driveway on those occasions. In a 2018 text message, Jennifer wrote Joseph, "even if when [Hanke] moves out here and I won't be open quote Living Together close quote for 11 years, sorry Charlie." In short, Jennifer's and Hanke's conduct demonstrated altered behavior so as not to illustrate a marriage-like relationship that was motivated by an awareness of the law concerning cohabitation. See *Herrin*, 262 Ill. App. 3d at 578 (analyzing whether a *de facto* marriage existed, the court considered that the alleged paramour was aware that if he married the petitioner or continuously slept at her residence, she would no longer receive maintenance).

¶ 81 Based on the non-exhaustive application of the six common-law factors helpful to our analysis, combined with evidence of the deep level of family blending and time spent together on holidays and vacations, the evidence of intended permanence, mutual commitment, and Hanke's clear familial caretaking role, as well as the awareness of the cohabitation rules and the couple's altered behavior, we find that Jennifer and Hanke were cohabiting under the terms of the MSA and that they have been involved in a *de facto* marriage since November 2021, when Jennifer publicly declared her relationship with Hanke. As such, we conclude that the trial court's finding of a *de facto* marriage was not against the manifest weight of the evidence. The court properly granted declaratory judgment in favor of Joseph and against Jennifer.

¶ 82                    D. Joseph's Cross-Appeal

¶ 83 On cross-appeal, Joseph argues that the trial court erred by allowing Jennifer to redact text messages containing personal information. In light of our cohabitation finding, this claim of error is moot.

¶ 84    Joseph also argues that the trial court erred when it failed to find that there had been a substantial change in his financial circumstances, warranting a modification of his obligations under the judgment. Paragraph 2.9 of the MSA states that "maintenance shall be modifiable as provided for in 750 ILCS 5/510." Section 510(a-5) of the Act provides that maintenance may be modified "only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2018). The party seeking modification bears the burden of proving this change. *In re Marriage of Logston*, 103 Ill. 2d 266, 287 (1984). A trial court's decision regarding modification of maintenance will not be disturbed absent an abuse of discretion. *Id*. An abuse of discretion occurs when the court's decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court." *In re Marriage of Osseck*, 2021 IL App (2d) 200268, ¶ 49.

¶ 85    "The ability of the maintenance-paying spouse to contribute to the other spouse's support can be properly determined by considering both the paying spouse's current and future ability to pay ongoing maintenance." *In re Marriage of Stoker*, 2021 IL App (5th) 200301, ¶ 76. "The trial court considers the level at which the spouse is able to contribute, not merely the level at which he is willing to work." *Id*. "When imputing income, a court must find one of the following: (1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity." *Id*.

¶ 86    Here, it was Joseph's burden, as the moving party, to establish that a substantial change in circumstances occurred. At the time of the divorce, Joseph earned $475,000 as the CEO of Oberweis Dairy. He owned 30% to 35% of the corporate stock. In 2022, he earned a salary of $429,000 but was eligible for bonuses. However, Joseph testified that he did not believe the bonus

plan was realistically attainable. When he attempted to bring in outside investors towards the end of 2022, he testified that he was the only shareholder in favor of raising capital. In what appeared to be a retaliatory move, Joseph's salary was reduced by the other shareholders to $300,000, effective January 1, 2023. Considering his dissatisfaction with his new salary and his belief that Oberweis Dairy needed outside capital, he sold his portion of corporate stock to his siblings for "a little less than $2,000,000" and tendered his letter of resignation as CEO in June of 2023. Thus, Joseph became voluntarily unemployed.

¶ 87   Joseph testified that, following his resignation, he began to search for new employment, although he believed it would take one to two years to become reemployed. He relied on the diversification of his assets while seeking new employment and his financial affidavit detailed two brokerage accounts with combined funds in excess of $3,300,000. He considered investing between $500,000 and $1 million of his own funds to purchase the dairy.

¶ 88   The evidence showed that Joseph did not modify his lifestyle since the reduction or the elimination of his salary from Oberweis Dairy. Joseph did not reduce any of his monthly expenditures since resigning from his position. He was able to pay his credit card bills in their entirety every month, including more than $30,000 in August 2023. In addition, he continued to pay his legal representation $20,000 per month. He also provides a monthly stipend of $3,500 to his current wife for personal use. Despite his unemployment, he had scheduled a vacation to Mexico, including airfare totaling $8,000, renting a house for $14,000, and retaining an on-site chef. He resides in an 8-bedroom house valued at $1,400,000.

¶ 89   Considering Joseph's testimony and the supporting evidence, the trial court found that Joseph had "substantial assets and is well-able to continue paying his maintenance obligation to Jennifer and to contribute to the child-related expenses as previously ordered, in spite of his loss

of income." Our review of the evidence supports the trial court's conclusion that Joseph has both the current and future ability to pay ongoing maintenance. *Stoker*, 2021 IL App (5th) 200301, ¶ 76. We find that the trial court did not abuse its discretion when it denied Joseph's motion to modify maintenance.

¶ 90                                     III. CONCLUSION

¶ 91    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 92    Affirmed.